Diana M. Torres (S.B.N. 162284)
diana.torres@kirkland.com
Lauren J. Schweitzer (S.B.N. 301654)
lauren.schweitzer@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400

Dale M. Cendali (S.B.N. 1969070)
dale.cendali@kirkland.com
Mary Mazzello (*pro hac vice* pending)
mary.mazzello@kirkland.com
Megan L. McKeown (*pro hac vice* pending)
megan.mckeown@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SOCIAL TECHNOLOGIES LLC, a Georgia limited liability company, | ) CASE NO.: 3:18-cv-05945-VC<br>)<br>) |
| Plaintiff, | ) **OPPOSITION TO PLAINTIFF'S MOTION**<br>) **FOR PRELIMINARY INJUNCTION** |
| vs. | )<br>) |
| APPLE INC., a California corporation, | )<br>) |
| Defendant. | )<br>) |

---

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

I.     FACTUAL BACKGROUND ........................................................................................ 2

       A.     Apple's Memoji Software Feature and Clearance of the Name Memoji ...................... 2

       B.     Apple's Acquisition of the MEMOJI Mark ................................................. 4

       C.     Apple's Announcement of Its Memoji Software Feature and Subsequent
              Correspondence with Social Tech ............................................................. 5

II.    LEGAL STANDARD ................................................................................................. 7

III.   SOCIAL TECH HAS NOT ESTABLISHED IRREPARABLE HARM ............................... 7

       A.     Social Tech's Strategic Decision to Delay Seeking Preliminary Injunctive
              Relief Demonstrates It Has Suffered No Irreparable Harm ........................... 7

       B.     Social Tech's Unsubstantiated Claims of Lost Business and Reputation Harm
              Are Not Evidence of Irreparable Harm ....................................................... 8

       C.     Social Tech's Spattering of Alleged Confusion Is Not Evidence of Irreparable
              Harm Factually or Legally .................................................................... 10

IV.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS ................................... 12

       A.     Social Tech Is Not Likely to Succeed Because Apple Used Its MEMOJI Mark
              Prior to Social Tech's Priority Date ......................................................... 12

              1.     Apple Has Priority in the Trademark MEMOJI ............................ 12

              2.     Social Tech's Claim That Apple Does Not Have Priority Is Legally
                     and Factually Deficient ......................................................... 14

              3.     The Rights to the MEMOJI Mark Were Validly Assigned ............... 19

       B.     Social Tech's MEMOJI Design Mark Registration Is Invalid ..................... 21

V.     THE BALANCE OF HARDSHIPS FAVORS APPLE ................................................... 21

VI.    THE PUBLIC INTEREST IS SERVED BY DENYING THE INJUNCTION ..................... 24

VII.   SOCIAL TECH SHOULD BE REQUIRED TO POST A BOND ...................................... 24

VIII.  CONCLUSION ...................................................................................................... 25

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adray v. Adry-Mart, Inc.*,
76 F.3d 984 (9th Cir. 1995), *as amended on denial of reh'g* (Feb. 15, 1996) ..............................17

*Alto Velo Racing Club v. Rouleur Sports Grp., LLC*,
15-cv-02144, 2015 WL 5462055 (N.D. Cal. Sept. 17, 2015)...................................................23, 24

*Arcsoft, Inc. v. Cyberlink Corp.*,
153 F. Supp. 3d 1057 (N.D. Cal. 2015) .............................................................................7, 10, 12

*Armida Winery Inc. v. The Cuban, LLC & Poison Spirits, Inc.*,
Cancellation No. 9206510, 2018 WL 3689355 (TTAB Aug. 1, 2018) ...................................17, 21

*Barnhardt Mfg. Co. v. Wildwood Gin, Inc.*,
Cancellation No. 9205323, 2013 WL 5407304 (TTAB June 17, 2013)..................................18, 21

*Blast Blow Dry Bar LLC v. Blown Away LLC*,
Cancellation No. 91204769, 2014 WL 108522 (TTAB Jan. 2, 2014)....................................17, 21

*Brantley v. Maxwell-Jolly*,
656 F. Supp. 2d 1161 (N.D. Cal. 2009) ........................................................................................25

*Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*,
493 F.2d 709 (9th Cir. 1974) ..................................................................................................15, 16

*ConsumerInfo.com, Inc. v. Money Mgmt. Int'l, Inc.*,
374 F. App'x 696 (9th Cir. 2010) ...........................................................................................13, 17

*Contender Partners, LLC v. Azteca Int'l Corp.*,
08-cv-02026, 2008 WL 11334492 (C.D. Cal. May 19, 2008)........................................................7

*Conversive, Inc. v. Conversagent, Inc.*,
433 F. Supp. 2d 1079 (C.D. Cal. 2006) ........................................................................................15

*Credit One Corp. v. Credit One Fin., Inc.*,
661 F. Supp. 2d 1134 (C.D. Cal. 2009) ..................................................................................17, 19

*Cybermedia, Inc. v. Symantec Corp.*,
19 F. Supp. 2d 1070 (N.D. Ca. 1998) ...........................................................................................25

*Downloadcard, Inc. v. Universal Music Grp., Inc.*,
02-cv-7710, 2002 WL 31662924 (S.D.N.Y. Nov. 26, 2002) .................................................23, 24

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
967 F.2d 1280 (9th Cir. 1992) ......................................................................................................19

*eMachines, Inc. v. Ready Access Memory, Inc.*,
  00-cv-00374, 2001 WL 456404 (C.D. Cal. Mar. 5, 2001) ....................................................19, 20

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,
  17-civ-06393, 2018 WL 659105 (N.D. Cal. Feb. 1, 2018)......................................................8, 11

*Farmasino, Inc. v. Farmasino Pharm. (Jiangsu) Co., Ltd*,
  15-cv-01877, 2016 WL 7655740 (C.D. Cal. June 20, 2016)............................................13, 14, 17

*First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*,
  356 F. Supp. 2d 1048 (N.D. Cal. 2005) .........................................................................................22

*First Niagara Ins. Brokers, Inc. v. First Niagara Fin. Grp., Inc.*,
  476 F.3d 867 (Fed. Cir. 2007)........................................................................................................21

*Glow Indus., Inc. v. Lopez*,
  252 F. Supp. 2d 962 (C.D. Cal. 2002) ....................................................................16, 17, 18, 19

*Gold Club-SF, LLC v. Platinum SJ Enter.*,
  13-cv-03797, 2013 WL 5273070 (N.D. Cal. Sept. 18, 2013).......................................................17

*Haas Automation, Inc. v. Denny*,
  12-cv-04779, 2014 WL 2966989 (C.D. Cal. July 1, 2014) .............................................................9

*Hanginout, Inc. v. Google, Inc.*,
  54 F. Supp. 3d 1109 (S.D. Cal. 2014)......................................................................................17, 19

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ............................................................................................. *passim*

*Instant Media, Inc. v. Microsoft Corp.*,
  07-cv-2639, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007).........................................................22

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ......................................................................................................24

*Long Island-Airports Limousine Serv. Corp. v. New York Airport Servs. Corp.*,
  641 F. Supp. 1005 (E.D.N.Y. 1986) .............................................................................................24

*Maxim Integrated Products, Inc. v Quintana*,
  654 F. Supp. 2d 1024 (N.D. Cal. 2009) .......................................................................................11

*Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*,
  16-cv-01841, 2016 WL 9275407 (C.D. Cal. Nov. 17, 2016) ............................................9, 10, 12

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*,
  230 F. Supp. 3d 1161 (C.D. Cal. 2017) .......................................................................................25

*Optimal Pets, Inc. v. Nutri-Vet, LLC*,
  877 F. Supp. 2d 953 (C.D. Cal. 2012) ....................................................................................17, 19

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
   55 F. Supp. 2d 1070 (C.D. Cal. 1999), *aff'd*, 202 F.3d 278 (9th Cir. 1999)..................................8

*Playmakers LLC v. ESPN, Inc.*,
   376 F.3d 894 (9th Cir. 2004) ..................................................................................................22

*Pollution Denim & Co. v. Pollution Clothing Co.*,
   547 F. Supp. 2d 1132 (C.D. Cal. 2007) .............................................................. *passim*

*Protech Diamond Tools, Inc. v. Liao*,
   08-cv-3684, 2009 WL 1626587 (N.D. Cal. June 8, 2009)..........................................7, 13

*Quigley v. Guvera IP Pty Ltd.*,
   10-cv-03569, 2010 WL 5300867 (N.D. Cal. Dec. 20, 2010) .....................................22

*QVC, Inc. v. Your Vitamins Inc.*,
   439 F. App'x 165 (3d Cir. 2007) ..............................................................................11

*Runway Beauty, Inc. v. Runway Magazine, Inc.*,
   09-cv-8333, 2011 WL 13213801 (C.D. Cal. Mar. 9, 2011) ..................................13, 17

*Russell Rd. Food & Beverage, LLC v. Spencer*,
   829 F.3d 1152 (9th Cir. 2016) ..................................................................................14

*Save Our Sonoran, Inc. v. Flowers*,
   408 F.3d 1113 (9th Cir. 2005) ..................................................................................25

*Seal Shield, LLC v. Otter Products, LLC*,
   13-cv-2736, 2014 WL 11350295 (S.D. Cal. Nov. 4, 2014)......................................17

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
   96 F.3d 1217 (9th Cir.), *as modified*, 97 F.3d 1460 (9th Cir. 1996)..........................12

*SolarEdge Techs. Inc. v. Enphase Energy, Inc.*,
   17-cv-04047, 2017 WL 3453378 (N.D. Cal. Aug. 11, 2017)..................................7, 10

*Spin Master, Ltd. v. Zobmondo Entm't, LLC*,
   944 F. Supp. 2d 830 (C.D. Cal. 2012) ....................................................................15

*Spiraledge, Inc., Inc. v. SeaWorld Entm't, Inc.*,
   13-cv-00296, 2013 WL 3467435 (S.D. Cal. July 9, 2013).................................9, 10, 12

*Sugar Busters LLC v. Brennan*,
   177 F.3d 258 (5th Cir. 1999) ....................................................................................20

*Sutter Home Winery, Inc. v. Madrona Vineyards LP*,
   05-cv-0587, 2005 WL 701599 (N.D. Cal. Mar. 23, 2005) ......................................23

*People of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
   766 F.2d 1319 (9th Cir. 1985) ..................................................................................25

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

*Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank*,
    696 F.2d 1371 (Fed. Cir. 1982) .............................................................................19, 20

*Watec Co., Ltd. v. Liu*,
    403 F.3d 645 (9th Cir. 2005) ...........................................................................15, 16, 19

*Well Care Pharmacy II, LLC v. W'Care, LLC*,
    13-cv-00540, 2013 WL 3200111 (D. Nev. June 24, 2013) .........................................12

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    12-cv-3856, 2014 WL 4312021 (N.D. Cal. Aug. 28, 2014) ................................8, 9, 12

*Wham-O, Inc. v. Paramount Pictures Corp.*,
    286 F. Supp. 2d 1254 (N.D. Cal. 2003) .....................................................................22

*Williams v. Green Valley RV, Inc.*,
    15-cv-01010, 2015 WL 4694075 (C.D. Cal. Aug. 6, 2015) .......................................10

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................7, 8, 9

## Statutes

15 U.S.C. § 1052 ...............................................................................................................21

15 U.S.C. § 1055 ...............................................................................................................20

15 U.S.C. § 1057 ..........................................................................................13, 14, 16, 17

15 U.S.C. § 1060 ...............................................................................................................19

15 U.S.C. § 1065 ...............................................................................................................16

15 U.S.C. § 1127 .........................................................................................................13, 21

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

## PRELIMINARY STATEMENT

The striking thing about Social Technologies' ("Social Tech") motion for a preliminary injunction is that it cannot show *any* of the elements required to obtain injunctive relief.  Social Tech is not the earliest user of the mark at issue, does not have rights that pre-date those of Apple Inc. ("Apple"), delayed for months in taking action, and cannot show irreparable harm, while the balance of hardships clearly favors Apple.

As a threshold matter, Social Tech's decision to wait nearly four months after Apple's announcement of the MEMOJI software feature before filing this lawsuit undercuts its claim of supposed irreparable harm.  Social Tech also offers no evidence of its supposed goodwill in the MEMOJI mark, likely because it has none.  It admits that it rushed a rudimentary version of its app to market *after* Apple announced its Memoji software feature.  Social Tech's flimsy claim of irreparable harm is precisely the sort of speculation the Ninth Circuit categorically rejects.

While the lack of irreparable harm alone is fatal to Social Tech's motion, what is even more confounding is that Social Tech sued Apple even though Apple is the party with priority in the MEMOJI mark.  Social Tech brought this action based solely on its hastily obtained federal trademark registration even though it is clear under U.S. trademark law that such a registration is meaningless against a prior user.  The irrefutable facts are that Apple acquired the MEMOJI mark from Lucky Bunny LLC and Big 3 Ent LLC (the "Prior Owners"), who began using the mark to national attention at least as early as September 2014.  That is ***over a year and a half before*** Social Tech filed its intent-to-use trademark application and ***nearly four years before*** Social Tech purportedly launched its app.  The Prior Owners' MEmoji app was available continuously from 2014 through 2018 and was downloaded ***92,862 times*** by consumers in ***every state***.  Its app received national media coverage on national television and satellite radio, and in leading national newspapers and news websites, including *USA Today*, *The Ellen Degeneres Show*, *The Howard Stern Show*, and *The Huffington Post*.  Yet despite the Prior Owners' well-established rights, rights now assigned to and owned by Apple, Social Tech chose to try to register its MEMOJI design mark anyway, even though it admitted that it was aware of the Prior Owners' use.  In fact, Apple on June 14, 2018 requested Social Tech abandon its then pending intent-to-use application based on Apple's

prior common law rights, but Social Tech instead rushed an app to market for the purpose of obtaining registration.  Such rushing of an app for the sole purpose of obtaining registration, despite awareness that another user had prior rights is not bona fide use in commerce, nor is it in good faith. A day prior to Social Tech filing this lawsuit, Apple filed a Petition to Cancel Social Tech's registration at the Trademark Trial and Appeal Board.  On this record, Social Tech cannot show a likelihood of success on the merits.  In fact, it is Social Tech that is infringing Apple's rights.

Putting aside the merits, the balance of hardships also powerfully favors Apple.  The iOS 12 software, which contains the Memoji software feature, has been released to millions of consumers and new iPhone devices containing this software have been packaged, shipped, and sold.  Reversing course now would be a significant undertaking resulting in immense backlash among consumers who have been enjoying the Memoji software feature for months.  Any "preliminary" injunction also effectively would be permanent, as once Apple adopts a new name, it cannot go back.

Finally, the public interest does not favor Social Tech.  Consumers should not be deprived of new technology, in this case the iOS 12 software, based on a plaintiff's belated and meritless claim.

## I.  FACTUAL BACKGROUND

### A.  Apple's Memoji Software Feature and Clearance of the Name Memoji

Apple is a world famous innovator in the consumer electronics and technology field.  In 2017, it debuted a novel emoji software feature called Animoji in the iPhone X device.  Knight ¶ 8. This feature allows users to mirror their facial expressions onto an array of animated characters (such as a unicorn, chicken, robot, cat, alien or dog) and then send these animated characters via the Messages app in a digital sticker or as a video file with the user's own voice.  *Id.*  The Animoji feature was a great success, as numerous news sources reported.  *Id.*

On the heels of this success, Apple wanted to expand the Animoji feature to allow users to create customizable personalized characters that resemble themselves.  *Id.* ¶ 9.  It thus created a new feature that allows users to create personalized characters based on their selection of various customizable options, such as face and hair, which users can then send to one another.  *Id.* Effectively, the new feature allows users to turn themselves into emojis and then send these self-emojis to one another.  *Id.*

Because the new feature was a natural evolution of the Animoji feature, and only accessible within Apple's Animoji feature, Apple wanted to find a name for it that was a natural evolution of the name Animoji. *Id*. ¶ 10.  Apple also wanted to find a name that consumers would connect with the Animoji feature's popularity and goodwill, yet was short enough to fit in a phone display. *Id*.  It came up with "Memoji." *Id*. ¶ 11.

Before adopting this name, Apple first conducted a clearance search.  La Perle ¶ 4.  In April of 2018, its outside counsel conducted a full, multinational trademark search on the mark MEMOJI for selfie emoji applications and conducted follow-up investigations based on the results of that search as part of Apple's clearance process. *Id*.

The search revealed the Prior Owners' active app in the App Store (the "MEmoji App"), which had been available to users since September 22, 2014. *Id*. ¶ 8; Jaynes ¶ 4.  The MEmoji App allowed users to "TURN [THEMSELVES] INTO AN EMOJI" and then text their "MEMOJI PHOTOS & VIDEOS TO [THEIR] FRIENDS."  La Perle ¶ 8.  To the best of Apple's knowledge, it was the first personalized emoji app to operate under the trademark MEMOJI. *Id.*  The Prior Owners promoted the app nationwide on Twitter through a dedicated account and through their website, thememojiapp.com. *Id*. ¶¶ 9, 25; Pl.'s Ex. 13.  It received **92,862** downloads from the App Store from consumers in all 50 states—16,548 in 2014; 11,850 in 2015; 59,720 in 2016; 4,366 in 2017; and 378 in 2018—and had 80,000 users.  La Perle ¶ 32; Jaynes ¶¶ 5–6.  And it received national public attention in the media, including from *The Ellen Degeneres Show*, *The Howard Stern Show*, *USA Today*, *AdWeek*, and *The Huffington Post.*  La Perle ¶¶ 9, 18, 23–24, 27.  The app was promoted by the comedian and actor Howie Mandel, and received significant attention on social media. *Id*. ¶¶ 10–24, 27, Exs. 1–15, 17 at 1.  The Prior Owners used the MEMOJI mark continuously in connection with the MEmoji App from the date the app launched.  As set forth more fully in the accompanying Declaration of Thomas R. La Perle, the Prior Owners also filed two trademark applications for the MEMOJI mark. *Id*. ¶¶ 6–7.  The first was abandoned for technical reasons—although the Prior Owners submitted a specimen showing use of the MEMOJI mark for software when they filed the application, they were not able to show use of the mark in connection with the caps, hats, and shirts that were also identified in their trademark application. *Id*. ¶ 6.  The

Prior Owners filed their second use-based application after Social Tech filed its intent-to-use application for a MEMOJI design mark (the "MEMOJI Design Mark"), and it was suspended because trademark examiners look only to the filing dates of the applications to determine which application may proceed to registration, not which mark was used first. *Id*. ¶ 7. Apple, however, filed a Petition to Cancel Social Tech's trademark registration to clear the path to registration for the Prior Owners' mark (which Apple now owns), and had put Social Tech on notice it had planned to do so on June 14, 2018. *Id*. ¶ 45.

Apple's search also revealed Social Tech's pending intent-to-use trademark application for the MEMOJI Design Mark, which Social Tech filed on April 1, 2016. *Id*. ¶ 28. Apple's investigation showed, however, that Social Tech was not using the MEMOJI Design Mark. *Id*. ¶ 30. It had no "Memoji" app on the App Store or Google Play, even though two years had passed since it filed its intent-to-use trademark application. *Id*. In fact, although Social Tech claimed on LinkedIn that its product was expected to launch in "the latter part of 2017," that time had passed without Social Tech launching a product with the name "Memoji." *Id*. ¶ 44. Social Tech also had not submitted a specimen of use to the United States Patent and Trademark Office ("PTO") showing use. *Id*. ¶ 31. Thus, although Social Tech had a pending intent-to-use trademark application, it had no use of and no rights in the MEMOJI Design Mark at the time of Apple's search.

Based on these facts, Social Tech filed its intent-to-use trademark application despite the Prior Owners' clearly prior rights. Social Tech acknowledges in its briefing that it was aware of the Prior Owners' MEmoji App when it filed its trademark application, but claims it disregarded the Prior Owners' rights because it believed that the Prior Owners had discontinued use of the mark. Bonet ¶ 6. This assumption was plainly baseless; not only were the Prior Owners still using the MEMOJI mark in 2016, their MEmoji App was downloaded nearly 60,000 times that year. Jaynes ¶ 5. Tellingly, nowhere in its papers does Social Tech claim that it contacted the Prior Owners to find out if they had in fact discontinued use. By contrast, as discussed below, before Apple adopted the name "Memoji" it did reach out to the Prior Owners and acquired their rights.

## B.    Apple's Acquisition of the MEMOJI Mark

As Dechert's searches revealed that the Prior Owners were prior users of the MEMOJI mark

in the United States, Apple's agent contacted the Prior Owners on or around May 19, 2018 to determine whether they were willing to sell the MEMOJI mark and the associated application.  *Id.* ¶ 32.  Apple's agent also contacted Social Tech on or around May 21, 2018 to inquire whether Social Tech was interested in selling whatever rights it might have in the MEMOJI mark (including its intent-to-use application) because, although Social Tech did not have priority, acquiring its application would help simplify the path for Apple to register the MEMOJI mark.  *Id.* ¶ 33; *see also id.*¶ 7 (explaining application process).  Social Tech responded that it was not interested.  *Id.*  The agent did not make any further attempts to contact Social Tech, but rather continued to negotiate with the Prior Owners who had priority over Social Tech through use in commerce.  *Id.* ¶¶ 33-34.

On May 31, 2018, the Prior Owners transferred and assigned "all right, title and interest in and to" the MEMOJI mark and the Prior Owners' pending trademark application "together with the goodwill connected with the use of and symbolized by" the MEMOJI mark to an Apple-owned Delaware LLC called MemoFun Apps LLC.  *Id.* ¶ 34, Ex. 19 at 2.  On June 5, 2018, Apple recorded at the PTO the assignment of the Prior Owners' rights in the MEMOJI mark to MemoFun Apps LLC, and the assignment of those rights from MemoFun Apps LLC to Apple.  *Id.* ¶¶ 34–35.  Pursuant to the assignment, Apple licensed the Prior Owners to continue offering the MEmoji App in the App Store until July 30, 2018.  *Id.* ¶¶ 34, 37.

### C.  Apple's Announcement of Its Memoji Software Feature and Subsequent Correspondence with Social Tech

On June 4, 2018, after the Prior Owners assigned the MEMOJI mark and all associated goodwill to Apple, Apple announced its Memoji software feature as part of its iOS 12 operating system at its highly publicized Worldwide Developers Conference ("WWDC").  It also released a beta version of its iOS 12 software, including the Memoji software feature, to developers and managed seed audiences that same day.  Knight ¶¶ 12–14, 18.

The WWDC keynote was well-publicized and widely available, and the Memoji software feature was a focal point.  Knight ¶¶ 12–14.  Immediately following the event, the Memoji software feature received substantial press coverage in numerous general interest publications such as *The Wall Street Journal*, *New York Magazine*, *Salon*, *Slate*, and *CNBC.com*, and in tech-publications

such as Gizmodo, TechCrunch, and CNET.  Knight ¶ 16.  Apple also began featuring the MEMOJI mark on its website immediately following the keynote and promoted the Memoji software feature in its press release regarding the WWDC event.  Knight ¶¶ 13, 15, Ex. 1 at 4–5.

Nine days after the announcement, Social Tech contacted Apple, citing the WWDC event and demanding that Apple immediately cease its use of the MEMOJI mark in light of Social Tech's intent-to-use application.  La Perle ¶ 38, Ex. 20 at 2–3.  Apple responded on June 14, 2018 explaining that Apple had prior rights, as Apple had acquired rights to the MEMOJI mark that predated Social Tech's intent-to-use application.  *Id.* ¶ 39, Ex. 21 at 1.  On June 22, 2018, Social Tech responded and reaffirmed its position.  *Id.* ¶ 40, Ex. 22 at 1–2.  Social Tech did not contact Apple again before filing this lawsuit.  *Id.* ¶ 41.

On June 25, 2018, Apple released the public beta version of iOS 12 through its Beta Software Program, which has millions of participants and is open to all users of the iPhone X mobile device. Knight ¶ 19.  At this time, Social Tech still had not launched its app.  Then, on June 28, 2018, following Apple's announcement and beta release of its Memoji software feature to millions of consumers, Social Tech hurriedly launched its free app on Google Play.  La Perle ¶ 31, 44, Ex. 18. Its apparent purpose in doing so was to engage—for the first time—in "use" of the MEMOJI Design Mark in commerce to perfect its dormant intent-to-use application.

On September 17, 2018, Apple made iOS 12 available for general public download.  Knight ¶ 21.  All existing iPhone X users could download iOS 12 and begin using the Memoji software feature.  *Id.*  And, in fact, iOS 12 has now been installed on approximately 53% of active devices introduced in the past four years.  *Id.* ¶ 5.  iOS 12 also comes pre-loaded on the iPhone XS and iPhone XS Max mobile devices, both of which were released on September 21, 2018 and thus have already been packaged, shipped, and are currently being sold.  *Id.* ¶¶ 20, 22.  iOS 12 also comes pre-loaded on the iPhone XR mobile device, which is available for pre-order and will be released on October 26, 2018.  *Id.* ¶¶ 20, 23.

On September 26, 2018, just eight days after Social Tech obtained its registration, Apple petitioned to cancel Social Tech's trademark registration based on Apple's prior rights.  La Perle ¶ 45.  Two days later, nearly four months after Apple first announced the Memoji software feature

and the parties' initial communications about each party's respective rights, and after nearly four years of use of the MEMOJI mark by the Prior Owners, Social Tech's counsel informed Apple that it had filed this lawsuit and was seeking a preliminary injunction. *Id.* ¶¶ 46.

## II.    LEGAL STANDARD

To obtain a preliminary injunction, the Court must consider whether Plaintiff has established (1) it is likely to suffer irreparable harm in the absence of relief, (2) it is likely to succeed on the merits, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A preliminary injunction is an "extraordinary remedy" that is "never awarded as of right." *Id.* at 24.  Rather, it may be awarded only upon a "clear showing that the plaintiff is entitled to such relief." *Id.* at 22; *see also SolarEdge Techs. Inc. v. Enphase Energy, Inc.*, 17-cv-04047, 2017 WL 3453378, at *2 (N.D. Cal. Aug. 11, 2017) (granted only "where the merits of the case plainly favor one party").  Courts will deny preliminary injunction motions in trademark cases where a plaintiff has not met its burden, even where the plaintiff owns a registration. *See, e.g.*, *Protech Diamond Tools, Inc. v. Liao*, 08-cv-3684, 2009 WL 1626587, at *4 (N.D. Cal. June 8, 2009) (plaintiff failed to establish irreparable harm or make a strong showing of likelihood of success as defendant presented evidence that it had priority); *Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1142 (C.D. Cal. 2007) (plaintiff failed to establish likelihood of success given defendant's prior use).  The same result is proper here, as Social Tech has failed to show that *any* of the four factors favors an injunction.

## III.    SOCIAL TECH HAS NOT ESTABLISHED IRREPARABLE HARM

A plaintiff seeking a preliminary injunction must show a likelihood of irreparable harm. *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  Social Tech has not met this requirement.  Its motion should be denied for this reason alone. *Id.*

### A.    Social Tech's Strategic Decision to Delay Seeking Preliminary Injunctive Relief Demonstrates It Has Suffered No Irreparable Harm

"The threat of irreparable harm must . . . be 'immediate' to warrant preliminary injunctive relief." *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015).  Social Tech's lack of urgency in bringing this motion is fatal to any such claim. *See Contender Partners,*

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION          CASE NO. 3:18-cv-05945-VC

*LLC v. Azteca Int'l Corp.*, 08-cv-02026, 2008 WL 11334492, at \*24 (C.D. Cal. May 19, 2008) (no irreparable harm where plaintiff waited nearly three months from sending cease-and-desist letter before seeking injunction); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999), *aff'd*, 202 F.3d 278 (9th Cir. 1999) (five-month delay in seeking injunctive relief showed there was no irreparable harm).

Apple announced the Memoji software feature on June 4, 2018 at its highly anticipated WWDC event to tremendous press coverage.  Knight ¶¶ 12–14, 16.  Social Tech cannot claim it was unaware of the announcement—it sent Apple a cease and desist letter just nine days later expressly referring to the announcement and alleging that it would be "damaged" by Apple's use of the MEMOJI mark.  La Perle ¶ 38, Ex. 20 at 1.  Yet despite this supposed concern, after some letter writing in June, Social Tech ***did nothing*** for months.  *Id.* ¶¶ 38–41.  It sat in wait while Apple launched the iOS 12 software, released its new iPhone devices, and developed enthusiasm among consumers for the new feature  Then, nearly four months after Apple's announcement, Social Tech sprung this lawsuit on Apple after months of silence. This delay alone is reason to deny Social Tech's motion.

### B.     Social Tech's Unsubstantiated Claims of Lost Business and Reputation Harm Are Not Evidence of Irreparable Harm

Not only did Social Tech delay inexcusably before filing this motion, it also failed to meet its burden of providing concrete, non-speculative evidence of irreparable harm.  *Herb Reed*, 736 F.3d at 1249.  It is indisputable that there is no presumption of irreparable harm.  *Id.* at 1249.  Nor does a mere "possibility" of harm suffice.  *Id.* (citing *Winter*, 55 U.S. at 22).  Rather, a plaintiff must establish that irreparable harm is "likely" in the absence of an injunction.  *Winter*, 55 U.S. at 22.  Irreparable harm, thus, must be "grounded in . . . evidence" and may not be based on speculation, conclusory statements, or mere "platitudes."  *Herb Reed*, 736 F.3d at 1250.  A plaintiff "must do more than simply submit a declaration insisting that its reputation and goodwill have been harmed." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 12-cv-3856, 2014 WL 4312021, at \*10 (N.D. Cal. Aug. 28, 2014); *see also Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.,* 17-civ-06393, 2018 WL 659105, at \*10 (N.D. Cal. Feb. 1, 2018).

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**            **CASE NO. 3:18-cv-05945-VC**

Social Tech's claimed irreparable injury to its business is precisely the type of speculative, unsubstantiated harm that is insufficient under *Winter*.  Social Tech states vaguely that it is losing "control of its MEMOJI brand and reputation," but offers no evidence to support this claim.  Br. at 2; *see also* Br. at 21.  This claims, thus, are too vague to meet Social Tech's burden.  *Wells Fargo*, 2014 WL 4312021, at *9 (claim that defendant caused plaintiff "to lose control over [its] goodwill and reputation" too speculative); *Mission Viejo Florist, Inc. v. Orchard Supply Co.*, *LLC*, 16-cv-01841, 2016 WL 9275407, at *7 (C.D. Cal. Nov. 17, 2016) ("unsupported" claim that plaintiff will "lose goodwill because [it] is a small business and Defendant, a large chain" did not to establish irreparable harm); *Spiraledge, Inc., Inc. v. SeaWorld Entm't, Inc.*, 13-cv-00296, 2013 WL 3467435, at *4 (S.D. Cal. July 9, 2013) (claims that confusion would "render [plaintiff] invisible in the marketplace" too speculative).

Social Tech also offers no evidence that it ever had any goodwill in the first place.  Nor could it.  Social Tech's app **did not exist** until June 28, 2018, and its promotional effort has been minimal.  Bonet ¶¶ 8, 12.  Its papers also are conspicuously silent regarding how many downloads its app has had, how much it spent on promotion, how many views its YouTube videos have had, or any of the other facts that might show whether it has goodwill in the MEMOJI Design Mark.  Further, the few reviews that Social Tech's app received on Google Play are overwhelmingly bad, with comments such as "It soooooo dumb," "This is the worst thing iv ever used," "It's so stupid you can't do anything," "Veryyy badd," "worst app ever," and "Doesn't work."  Torres ¶ 3, Ex. 1 at 2.  Social Tech, thus, has no goodwill or reputation in the mark MEMOJI that could be harmed.  *See Haas Automation, Inc. v. Denny*, 12-cv-04779, 2014 WL 2966989, at *8–9 (C.D. Cal. July 1, 2014) (no irreparable harm where plaintiff "provided no evidence relating to its goodwill").

Social Tech also claims that it has been harmed because it "has not attempted to enter its MEMOJI app into Apple's App Store" as "according to [Social Tech's] attorney," doing so could result in "waiver" of rights.  Br. at 7; Bonet ¶ 19.  Social Tech does not explain the basis for this belief.  Nor is Social Tech's decision not to launch in the App Store in any way Apple's fault.  Had Social Tech created a functioning app, it **could have launched** it in the App Store years ago.  In any case, Social Tech eventually launched its app on Google Play, which it, again, could have done years

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**            **CASE NO. 3:18-cv-05945-VC**

earlier.  To the extent it is arguing that it is missing out on downloads from the App Store that it otherwise might have had, that is a quintessential example of the sort of speculation courts must reject.  *Arcsoft*, 153 F. Supp. 3d at 1074 ("vague and unsubstantiated" and "utterly speculative" claims insufficient); *Mission Viejo*, 2016 WL 9275407, at *7 (claim that plaintiff would lose "prospective clients, and growth of its business too speculative to establish irreparable harm").

Equally insufficient is Social Tech's claim that Apple's marketing impacted Social Tech's Internet search results for its app.  Br. at 22.  Social Tech offers no actual evidence to support this claim as it did not provide any of the searches it allegedly conducted either before or after Apple's announcement.  Instead, it relies on an unsubstantiated, self-serving declaration, exactly what courts in this Circuit say not to do.  *See, e.g.*, *SolarEdge*, 2017 WL 3453378, at *6 (no irreparable harm where executive's claims not supported by data).  Moreover, even if Social Tech had attached its searches, this would prove nothing, as Internet searches are individualized and prone to variation.  It is no surprise then that Social Tech cited no authority finding irreparable harm based on Internet search results, and Apple is aware of none.  *See Spiraledge*, 2013 WL 3467435, at *4 (Google search results insufficient as plaintiff "failed to submit probative, nonspeculative evidence that [plaintiff] has lost, or likely will lose, prospective customers or goodwill" and "cited no authority indicating that irreparable injury may be found or presumed based upon positioning in Google searches").

### C.    Social Tech's Spattering of Alleged Confusion Is Not Evidence of Irreparable Harm Factually or Legally

Social Tech's reliance on five supposed instances of "confusion and frustration" among four unknown individuals is similarly unpersuasive.  Br. at 22.  In the Ninth Circuit, evidence of actual confusion *is not enough* to establish irreparable harm.  *Herb Reed*, 736 F.3d at 1250.  The moving party must also show *separately* that it will suffer irreparable harm.  *Id.*; *Arcsoft*, 153 F. Supp. 3d at 1072–73 (alleged "instances of actual confusion" that "can only result in further instances [and] loss . . . of goodwill and recognition" not persuasive as they were "nothing more than a regurgitation of consumer confusion evidence"); *Williams v. Green Valley RV, Inc.*, 15-cv-01010, 2015 WL 4694075, at *3 (C.D. Cal. Aug. 6, 2015) ("[e]vidence of customer confusion without proof of likely irreparable harm is not enough."); *Spiraledge*, 2013 WL 3467435, at *4 (inquiries from confused

individuals did not establish irreparable harm).  Otherwise, the irreparable harm and likelihood of success factors would collapse improperly into one.  *Herb Reed*, 736 F.3d at 1250.  These posts thus have no persuasive value in establishing irreparable harm.

The five messages do not, in any case, actually evidence "confusion or frustration" resulting from Apple's selection of the name Memoji.  Br. at 6–7; Bonet ¶¶ 15–18.  Nor are social media posts by unknown individuals, who could very well be affiliated with Social Tech, reliable evidence.  *See, e.g.*, *QVC, Inc. v. Your Vitamins Inc.*, 439 F. App'x 165, 168–69 (3d Cir. 2007) ("[U]se of false identities in Internet forums is now a well-known tactic for attacking corporate rivals . . . .  Even if a poster is 'legitimate,' doubts will often remain as to the sincerity of the comment.").

Two of the messages appear to be from the same person.  The first asks, "When will y'all make the memoji app look and function like this memoji app on iPhones?" and the second states, "Trash! No emoji transformation whatsoever.  Nothing like the memoji update on the iPhone!!!  Please don't even waste your time downloading.  Keeps crashing as well."  Bonet ¶¶ 15–16.  It is clear that this person knew Social Tech's app and Apple's software feature were two separate things, with Social Tech's being inferior and causing frustration for that reason.[1]  The other three messages also say nothing about confusion.  Instead, they are messages from unknown individuals asking about use of Social Tech's app on the iPhone device, a natural inquiry given the iPhone device's prominence.  Bonet ¶¶ 17–18.  Social Tech claims these questions show confusion because its app is only available on Android, but these questions were addressed to Social Tech's Facebook page, which does not state that the app is not available for the iPhone.  And even assuming *arguendo* that these posts evidenced actual, relevant confusion, five posts by four individuals just is not enough to establish irreparable harm.  *See Equinox Hotel*, 2018 WL 659105, at *10 (eleven instances of confusion insufficient to establish loss of control over business reputation).

Finally, Social Tech argues that the alleged consumer confusion between the marks "naturally risks the senior user's reputation in an irreparable way."  Br. at 22.  This, again, is the

---

[1] This case is distinguishable from *Maxim Integrated Products, Inc. v Quintana*, 654 F. Supp. 2d 1024 (N.D. Cal. 2009).  There, the plaintiff received a negative review that appeared intended for the defendant.  Social Tech's negative reviews were intended for it due to its app's poor quality.

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

exact type of conclusory, unsupported allegation that the Ninth Circuit rejected in *Herb Reed*. 736 F.3d at 1250 (overturning finding of irreparable harm "grounded in platitudes rather than evidence," even where there was one instance of actual confusion); *Arcsoft*, 153 F. Supp. 3d at 1074 (rejecting speculative claims of harm); *Wells Fargo*, 2014 WL 4312021, at *10 (same); *Mission Viejo*, 2016 WL 9275407, at *7 (same); *Spiraledge*, 2013 WL 3467435, at *4 (same).[2]   Social Tech had almost four months to find evidence of irreparable harm.  Its failure to come forward with evidence that actually shows that it is likely to suffer irreparable harm dooms its motion.

## IV.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS

### A.   Social Tech Is Not Likely to Succeed Because Apple Used Its MEMOJI Mark Prior to Social Tech's Priority Date

Social Tech's motion for a preliminary injunction should fail for the second, independent reason that it cannot establish a likelihood of success on the merits because it does not have priority in the MEMOJI mark.  Rather, Apple has priority by virtue of its assignment from the Prior Owners.

### 1.   Apple Has Priority in the Trademark MEMOJI

To succeed on its claim, Social Tech must establish that it owns valid, protectable rights in its MEMOJI Design Mark.  Lacking any evidence that it was the first user of the term "Memoji," Social Tech relies exclusively on its trademark registration to meet this burden.  Br. at 11.  But the supposed rights conferred by this registration crumble in the face of Apple's prior use.

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.), *as modified*, 97 F.3d 1460 (9th Cir. 1996).  "[I]t is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."  *Id.*  Although a federal trademark registration confers "a presumption of ownership, dating to the filing date of the application," ***this presumption can be rebutted*** "if the non-registrant can show that ***he used the mark in commerce first.***"  *Id.* (emphasis added).  "[E]ven a '*single sale or shipment*' of a product bearing a mark may be sufficient to show use in commerce, provided that the

---

[2] Unsurprisingly, the case Social Tech cites to argue that irreparable harm can be inferred from a likelihood of confusion, *Well Care Pharmacy II, LLC v. W'Care, LLC*, 13-cv-00540, 2013 WL 3200111, at *8 (D. Nev. June 24, 2013), predates the Ninth Circuit's *Herb Reed* decision.

transaction is bona fide and there are subsequent activities evidencing 'a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade.'" *Protech Diamond*, 2009 WL 1626587, at *4.

Once such prior use is established, the owner of a trademark registration may assert rights against the prior user only if the prior user later abandons its rights.  15 U.S.C. § 1057(c) ("registration does not secure priority against a person whose mark has not been abandoned" and who, prior to such filing has "used" the mark); *see also ConsumerInfo.com, Inc. v. Money Mgmt. Int'l, Inc.*, 374 F. App'x 696, 697 (9th Cir. 2010) ("a registered mark cannot be asserted against a person who used the otherwise infringing mark in commerce before the priority date of the registered mark").  The standard for abandonment is very high, requiring proof of non-use and an intent not to resume use, and may be presumed only after three years of non-use.  15 U.S.C. § 1127.

A defendant's evidence of prior use may defeat a registered trademark owner's infringement claim.  *See, e.g.*, *ConsumerInfo*, 374 F. App'x at 697 (reversing summary judgment where defendant presented evidence of prior sales and promotion); *Farmasino, Inc. v. Farmasino Pharm. (Jiangsu) Co., Ltd*, 15-cv-01877, 2016 WL 7655740, at *7 (C.D. Cal. June 20, 2016) (denying plaintiff's infringement claim where defendant showed prior use based on sales in ten states across four years and use of the mark at trade shows and on website); *Runway Beauty, Inc. v. Runway Magazine, Inc.*, 09-cv-8333, 2011 WL 13213801, at *3 (C.D. Cal. Mar. 9, 2011) (denying summary judgment to plaintiff where defendant used the mark on a magazine available in four states, in two domain names, and on business cards and media kits prior to plaintiff's registration); *Pollution Denim*, 547 F. Supp. 2d at 1142 (denying preliminary injunction where defendant rebutted plaintiff's priority claim with "limited" sales in Oklahoma City followed by expansion into a national market).

Here, Apple is the prior user and, thus, Social Tech has no rights to assert against it.  The Prior Owners began offering the MEmoji App in the App Store *in September 2014*—a year and a half before Social Tech filed its intent-to-use trademark application and nearly four years before Social Tech launched its app.  La Perle ¶ 28; Jaynes ¶ 4.  The MEmoji App was then downloaded 16,548 times that year alone.  Jaynes ¶ 5.  The Prior Owners then continued offering the MEmoji App, without interruption, under the trademark MEMOJI until it was removed from the App Store in

July 2018.  *Id.*; La Perle ¶ 37.  During its nearly four years on the market, the Prior Owners' MEmoji App was downloaded over 92,000 times—including nearly 60,000 downloads in 2016, the year Social Tech inexplicably filed its intent-to-use trademark application—by numerous consumers in every state across the country, and had 80,000 users at the time Apple acquired the Prior Owners' rights.  Jaynes ¶¶ 5–6; La Perle ¶ 32.

The Prior Owners also promoted the MEmoji App to consumers nationwide from 2014 until Apple's acquisition of the mark in 2018 through a dedicated website and Twitter account.  La Perle ¶¶ 9, 25.  And the app received national media coverage from numerous news and entertainment sources before Social Tech filed its intent-to-use trademark application, as well as backing from Howie Mandel who tweeted about the app and otherwise promoted it extensively.  *Id.* ¶ 9–24, 27.

Given this uninterrupted use and widespread promotion of the MEMOJI mark, there can be no doubt that the Prior Owners used the mark in commerce *before* Social Tech filed its trademark application.  *See Farmasino*, 2016 WL 7655740, at *7 (defendant established prior use based on sales in ten states across 4 years and use of the mark at trade shows and on its website); *Pollution Denim*, 547 F. Supp. 2d at 1142 ("limited" sales in Oklahoma City followed by expansion into a national market sufficient to rebut plaintiff's priority claim).  And Apple, as the Prior Owners' assignee, steps into the shoes of the Prior Owners.  *Russell Rd. Food & Beverage, LLC v. Spencer*, 829 F.3d 1152, 1156 (9th Cir. 2016).  It, thus, is entitled to all of their rights, including their priority date.  *Id.*  Accordingly, Social Tech cannot enjoin Apple from using the MEMOJI mark as Apple has priority, not Social Tech.  *See* 15 U.S.C. § 1057(c); *Pollution Denim*, 547 F. Supp. 2d at 1142 (denying preliminary injunction as defendant rebutted plaintiff's presumption of priority).

> **2.      Social Tech's Claim That Apple Does Not Have Priority Is Legally and Factually Deficient**

Despite Apple's more than four years of prior use of the MEMOJI mark, Social Tech argues that Apple does not have priority.  Its claims are based on several mistaken assumptions about the Prior Owners' MEmoji App as well as a misapplication of the relevant law.

> **a.      The Prior Owners Continuously Used the MEMOJI Mark**

*First*, Social Tech argues that Apple cannot show continuous use of the MEMOJI mark

because the Prior Owners "discontinued use of the mark by ceasing promotion of the app by November 2014 . . . and fail[ed] to provide any updates to its app after November 2014."  Br. at 12. This claim is utterly at odds with the facts.  The Prior Owners' MEmoji App not only was available continuously on the App Store and promoted without interruption through a nationwide website, but ***thousands of consumers*** nationwide also downloaded it ***every year*** from launch through 2017, and hundreds downloaded it in just the first half of 2018 before its removal from the App Store.  Jaynes ¶¶ 5–6.  The Prior Owners also filed a trademark application for MEMOJI, further manifesting their intent to continue using the mark.  La Perle ¶ 7.

Ignoring that as a factual matter the Prior Owners' MEmoji App was downloaded tens of thousands of times before Social Tech filed its intent-to-use trademark application, Social Tech claims that the Prior Owners discontinued use of the MEMOJI mark by not updating their app. Social Tech cites no authority supporting this position, nor would such a rule make sense.  Indeed, no one would argue that the COCA-COLA mark has been discontinued because the formula for the soda has not changed in years.  Rather, in all of the cases Social Tech cites, the court found that use of the mark was not continuous because there was evidence of a year or more of *non-use*, not because the product had not been upgraded.  *See Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 712 (9th Cir. 1974) (defendant closed all of its stores and there was "complete nonuse of the mark for [a] one-year period"); *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 851 (C.D. Cal. 2012) (two-year period during which six units were sold on one day too "sporadic, casual, and nominal" to be continuous); *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1089 (C.D. Cal. 2006) ("no use" of the mark during a two-year period).[3]

What Social Tech really is doing is trying to justify its own decision to adopt the MEMOJI mark despite its awareness of the Prior Owners' MEmoji App.  In 2016, Social Tech *knew* the Prior Owners' app was available on the App Store, and had been since 2014.  Bonet ¶ 6.  Yet it chose to file a trademark application for the MEMOJI mark anyway, thus trampling on the Prior Owners' established rights and blocking them from obtaining their own registration.  It rationalized its

---

[3] In *Watec Co., Ltd. v. Liu*, which Social Tech also cites, the plaintiff's use of its mark ***was continuous*** where it used the mark through a licensee.  403 F.3d 645, 654 (9th Cir. 2005).

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

behavior by telling itself that the Prior Owners had discontinued use of the mark by not upgrading their app, but even this is suspect as Social Tech easily could have determined whether the Prior Owners discontinued their use by simply calling them, as Apple did.  It appears, instead, that Social Tech merely was hoping that the Prior Owners would go out of business, so they could swoop in and use the MEMOJI mark.  Now Social Tech wants a benefit from its own lack of diligence.  It cannot have one.  The Prior Owners and Apple have continuously used the MEMOJI mark since 2014 and thus, have priority.  Jaynes ¶ 5; La Perle ¶ 37.  *See Pollution Denim*, 547 F. Supp. 2d at 1142 (evidence that defendant continuously used the mark in marketing and sales rebutted presumption).

In any case, Social Tech's focus on continuous use is misplaced.  When a plaintiff's trademark registration is not "incontestable," *e.g.*, when the registration is less than five years old, as Social Tech's registration is, the law does not require a defendant claiming priority to show continuous use.  15 U.S.C. § 1057(c)(1).  All that is required is that the prior user "used" the mark and did not "abandon" it.  *Id.*  By contrast, when a plaintiff's registration is incontestable, the law requires that the defendant show not just prior use but "continuing" use as well.  15 U.S.C. § 1065.  *Casual Corner*, which Social Tech cites as the Ninth Circuit case imposing a continuous use requirement on a defendant seeking to rebut a plaintiff's priority claim, involved an *incontestable* trademark and, thus, is not instructive here.  493 F.2d at 712.  *Watec Co. v. Liu* similarly explains that *Casual Corners* applies to "a litigant claiming § 1065 senior right," *i.e.*, rights superior to an *incontestable* registration.  403 F.3d 645, 653 (9th Cir. 2005).

### b.      Market Penetration Is Neither Lacking Nor Required

Second, Social Tech argues that Apple "cannot show the requisite market penetration in a specific geographic area to establish common law rights."  *See* Br. at 13.  Again, Social Tech's argument is factually and legally deficient.

### i.      Market Penetration Is Not Required to Defeat a Plaintiff's Priority Claim

As a preliminary matter, Apple is not required to show market penetration.  In the Ninth Circuit, the market penetration doctrine applies only when ***a party with common law rights asserts a trademark infringement claim*** against an alleged infringer.  *E.g.*, *Glow Indus., Inc. v. Lopez*, 252 F.

Supp. 2d 962, 983 (C.D. Cal. 2002) ("the senior user of a mark is entitled **to assert trademark rights** in all areas in which it has legally sufficient market penetration") (emphasis added).  This is the situation in every case Social Tech cites to support its position.  *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995), *as amended on denial of reh'g* (Feb. 15, 1996) (market penetration used to determine location where common law mark had secondary meaning); *Gold Club-SF, LLC v. Platinum SJ Enter.*, 13-cv-03797, 2013 WL 5273070, at *7 (N.D. Cal. Sept. 18, 2013) (plaintiff was a common law user asserting infringement); *Hanginout, Inc. v. Google, Inc.,* 54 F. Supp. 3d 1109, 1121 (S.D. Cal. 2014) (same); *Optimal Pets, Inc. v. Nutri-Vet, LLC,* 877 F. Supp. 2d 953, 961 (C.D. Cal. 2012) (same); *Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1138 (C.D. Cal. 2009) (same); *Glow Indus.*, 252 F. Supp. 2d at 976 (same).  Market penetration is necessary in such a situation because a plaintiff can enjoin a defendant from using a trademark only in the geographic territory where the plaintiff has established rights.  *See, e.g.*, *Adray*, 76 F.3d at 989.

By contrast, when a defendant is asserting prior rights to rebut a plaintiff's assertion of priority based on a federal trademark registration—which is the situation here—market penetration is not required.  *See, e.g.*, *ConsumerInfo.com*, 374 F. App'x at 697 (finding evidence sufficient to rebut priority claim without requiring showing of market penetration); *Farmasino*, 2016 WL 7655740, at *7 (same); *Runway Beauty*, 2011 WL 13213801, at *3 (same); *Pollution Denim*, 547 F. Supp. 2d at 1142 (same).  All that is required is prior use.  *Id*.  That is because a trademark user has a proprietary interest in a trademark upon its first use of the mark, regardless of the geographic scope of such use.  *Seal Shield, LLC v. Otter Products, LLC*, 13-cv-2736, 2014 WL 11350295, at *7 (S.D. Cal. Nov. 4, 2014), *aff'd sub nom.,* 680 F. App'x 560 (9th Cir. 2017).  This is consistent with the Lanham Act, which does not impose a market penetration requirement.  15 U.S.C. § 1057(c).  It also is consistent with the PTO's practice of denying registrations to applicants if a challenger used the mark first, regardless of whether the challenger had market penetration.  *See, e.g.*, *Armida Winery Inc. v. The Cuban, LLC & Poison Spirits, Inc.*, Cancellation No. 9206510, 2018 WL 3689355, at *10 n. 24 (TTAB Aug. 1, 2018) ("A finding of priority before the Board does not require . . . market penetration") (non-precedential); *Blast Blow Dry Bar LLC v. Blown Away LLC*, Cancellation No. 91204769, 2014 WL 108522, at *5 (TTAB Jan. 2, 2014) (denying registration as opposer provided

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**　　　　**CASE NO. 3:18-cv-05945-VC**

hair styling services to four individuals for free before applicant used the mark) (non-precedential); *Barnhardt Mfg. Co. v. Wildwood Gin, Inc.*, Cancellation No. 9205323, 2013 WL 5407304, at *4 (TTAB June 17, 2013) ("Our precedent does not require . . . any particular degree of market penetration in order to establish priority.") (non-precedential). Accordingly, Apple is not required to establish market penetration to overcome Social Tech's priority claim.

ii.     The Prior Owners Had National Market Penetration

Further, regardless of whether market penetration is required, Apple has it. When evaluating market penetration, courts consider "[1] the trademark user's volume of sales and growth trends, [2] the number of persons buying the trademarked product in relation to the number of potential purchasers, and [3] the amount of advertising." *Glow Indus.*, 252 F. Supp. 2d at 983. Social Tech conclusorily argues that Apple "cannot show the requisite market penetration." Br. at 13. But the facts establish that Social Tech is wrong. The MEmoji App had a national reputation through its nationwide advertising and downloads prior to Social Tech filings its intent-to-use application.

Again, in under four years, the Prior Owners' MEmoji App—which at all times bore the MEMOJI mark—was downloaded over 92,000 times and had 80,000 users. Jaynes ¶ 5; La Perle ¶ 32. More than 28,000 of those downloads occurred in 2014 and 2015, and nearly 60,000 occurred in 2016. Jaynes ¶ 5. These numbers are significant. For example, just before the Prior Owners' MEmoji App launched, the average app was downloaded only 40,000 times from Apple's App Store and, outside the top 6% of apps, the median user base was only 27,500 users. Torres, Ex. 2 at 2, Ex. 3 at 2. The Prior Owners' numbers are substantially higher.

The MEmoji App also was widely distributed geographically. Consumers from every state downloaded the app in each year from 2014 through 2016, and consumers from at least 45 states downloaded it each year in 2017 and 2018. Jaynes ¶ 6. Further, once consumers downloaded the app, there was no need for them to download it again. La Perle ¶ 8. Thus, although the number of downloads decreased in 2017 and 2018—after substantial growth between 2014 and 2016—that does not necessarily signify decreased engagement with the app. Consumers who had downloaded it previously could continue engaging without re-downloading. *Id.* The MEmoji App also was publicized extensively to a national audience online, on social media, on talk shows, and in national

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

news sources.  La Perle ¶¶ 9–27, Exs. 1–17.  Thus, to the extent required, Apple had nationwide

market penetration sufficient to defeat Social Tech's claim.  *See Watec*, 403 F.3d at 653–54 (senior

user had "nationwide" rights through national advertising).

Given these facts, Social Tech's reliance on *Hanginout v. Google* is unavailing.  Br. at 14–

15.  There, the plaintiff, which was seeking to enforce common law rights to obtain a preliminary

injunction, had only 8,200 registered users total, and only 200 users when Google launched its

allegedly infringing product.  *Hanginout*, 54 F. Supp. 3d at 1122–23.  It also "never identified the

state of residence of [its] alleged" users.  *Id.* at 1122.  Thus, the court had no choice but to find that

that plaintiff "had not presented sufficient evidence to permit the Court to determine its market

penetration." *Id.* at 1124.[4]  The evidence here is starkly different.  Jaynes ¶¶ 5–6; La Perle ¶¶ 9–27.

### 3.      The Rights to the MEMOJI Mark Were Validly Assigned

Social Tech's final attack on Apple's rights is that the assignment is an invalid assignment

"in gross."  Br. at 16.  Not so.  It is black letter law that a trademark is "assignable with the goodwill

of the business in which the mark is used, or with that part of the goodwill of the business connected

with the use of and symbolized by the mark."  15 U.S.C. § 1060.  "It is not necessary that the entire

business or its tangible assets be transferred"—just the goodwill.  *E. & J. Gallo Winery v. Gallo

Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992); *eMachines, Inc. v. Ready Access Memory, Inc.*, 00-

cv-00374, 2001 WL 456404, at *11 (C.D. Cal. Mar. 5, 2001) ("While an entire business or its

tangible assets need not be transferred, the good will of the business must accompany the mark.").

In addition, for an assignment to be valid, the goods and services need not be "identical," so long as

they are "sufficiently similar to prevent consumers of the service offered under the mark from being

misled from established associations with the mark."  *Visa, U.S.A., Inc. v. Birmingham Tr. Nat.

Bank*, 696 F.2d 1371, 1376 (Fed. Cir. 1982).

Here, the assignment was not an assignment in gross because all of the goodwill in the Prior

---

[4] The plaintiffs in the remaining cases Social Tech cites similarly lacked support for their claim of
market penetration.  *Optimal Pets,* 877 F. Supp. 2d at 962 ("no sales at all in 34 states"); *Credit One*,
661 F. Supp. 2d at 1138 (plaintiff's only evidence was that it "receive[d] payments from customers
in both states, maintain[ed] business licenses in both states, and assert[ed] that it continu[ed] to do
business in those states"); *Glow Indus.*, 252 F. Supp. 2d at 984 (plaintiff "provid[ed] little
information that would assist the court in quantifying" the relevant factors).

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

Owners' MEMOJI mark transferred to Apple.  The assignment agreement explicitly states that the Prior Owners transferred the MEMOJI mark and pending application "***together with the goodwill connected with the use of and symbolized by the Mark***."  La Perle Ex. 19 at 2.   The Prior Owners continued to use the MEMOJI mark for approximately two months after the assignment as Apple's licensee.  *Id.* ¶ 37.  Under 15 U.S.C. § 1055, such use inured to Apple's benefit.  And there is sufficient similarity between the parties' goods as both the Prior Owners' MEmoji App and Apple's Memoji software feature are mobile application software that "allow[] users to create emojis of themselves," which "can then be shared with friends through text message."  *Id.* ¶ 36.   Accordingly, the assignment was not an assignment in gross.  *See eMachines*, 2001 WL 456404, at *11 (assignment valid as both companies "were in the business of manufacturing and selling computer components, specifically notebooks and computer monitors for use with PC compatible systems" and agreement manifested an intent to transfer the goodwill).

Social Tech's arguments to the contrary are unavailing.  It argues that the Prior Owners "abandoned the mobile app with which its mark was associated in 2014, leaving its assignment to Apple in 2018 devoid of any goodwill."  Br. at 16–17.  As already described, this allegation is patently false.  Far from being abandoned, the app was continuously available on the App Store through July 2018, nearly two months after the assignment to Apple and continued to be downloaded throughout that time.  La Perle ¶¶ 34, 37; Jaynes ¶ 5.

Social Tech also claims the assignment was in gross because "there is a lack of continuity" between the Prior Owners' MEmoji App and Apple's Memoji software feature as the Prior Owners app was "more basic."  Br. at 17.  Although there are undoubtedly some additional technological capabilities that Apple's Memoji software feature provides, Apple is still offering users the ability to create similar self-emojis "albeit in a[n] . . . expanded way."  *Visa*, 696 F.2d at 1376.[5]  This argument, thus, fails as well.  *Id.*; *eMachines*, 2001 WL 456404, at *11 (business sufficiently similar

---

[5] Apple's Memoji software feature and the Prior Owners' MEmoji App are far more similar than the diet book and "retail store that provides diabetic supplies" in *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 266 (5th Cir. 1999).  In that case, the diet book and retail store services were not even in the same "Class" for registration purposes: the diet book fell within Class 16 and retail store services fell within Class 42.  *Id.*  By contrast, both Apple's Memoji software feature and the Prior Owners' MEmoji App would fall within Class 9 as they are both software products.

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION          CASE NO. 3:18-cv-05945-VC

where both were in the business of "manufacturing and selling computer components").

> **B.      Social Tech's MEMOJI Design Mark Registration Is Invalid**

Not only is Social Tech's registration insufficient to establish priority given Apple's prior use, the registration also likely is invalid.

*First*, to obtain a trademark registration, a party must use a mark in commerce.  This requires "bona fide use of a mark in the ordinary course of trade, ***and not made merely to reserve a right in a mark***." 15 U.S.C. § 1127 (emphasis added).  By its own admission, Social Tech launched its app before it was complete.  Bonet ¶ 12.  And although it claims it did so to combat the publicity for Apple's Memoji software feature, *see id.*, the timing suggests that the real reason Social Tech rushed its app to market was to perfect its intent-to-use trademark application so it could sue Apple.  Social Tech's trademark registration, thus, should be cancelled due to Social Tech's lack of bona fide use.

*Second*, Apple filed a petition to cancel Social Tech's trademark registration for MEMOJI with the Trademark Trial and Appeal Board based on its prior use of the mark.  La Perle ¶ 45.  A registration may be cancelled if it is likely to cause confusion with a mark "previously used in the United States by another and not abandoned."  15 U.S.C. § 1052(d).  "[M]ere use" is sufficient.  *First Niagara Ins. Brokers, Inc. v. First Niagara Fin. Grp., Inc.*, 476 F.3d 867, 871 (Fed. Cir. 2007).  The party petitioning to cancel need not establish use in intrastate commerce or market penetration; use in even a single state is sufficient to cancel a registration.  *Id.*; *Armida Winery*, 2018 WL 3689355, at *14; *Blast Blow Dry Bar*, 2014 WL 108522, at *5; *Barnhardt*, 2013 WL 5407304, at *4.  Thus, Apple will be able to cancel Social Tech's trademark registration based on its prior use of MEMOJI.  Once that registration falls, Social Tech's alleged priority date will as well.

## V.      THE BALANCE OF HARDSHIPS FAVORS APPLE

If ever there was a case where the balance of hardships favors the defendant, this is it.  While Social Tech tries to downplay the impact by claiming that an injunction merely would require Apple to "use a different name," this ignores the business reality of the situation.  The fact is that after Apple conducted a trademark search and acquired trademark rights from the first user of the MEMOJI mark, it launched its new iOS 12 software to millions of users and tremendous fanfare.  La Perle ¶ 4; Knight ¶¶ 12–19, 21.  The Memoji software feature is embedded in this software.  *See*

Knight ¶¶ 18–19, 21, 25.  Eliminating it now would require tremendous effort and cause considerable financial and reputational harm to Apple.  *Id*. ¶¶ 24–36.

*First*, if an injunction issues, Apple will have to halt downloads of iOS 12 while it selects and clears a new name and creates replacement software.  Knight ¶ 32.  This would cause significant damage to Apple's reputation as consumers have been looking forward to iOS 12 for months.  *Id*. ¶ 32.  They will be incredibly disappointed if this feature that they were promised is taken away.  *Id*. ¶¶ 32–33.  In fact, Apple's yearly iOS announcement has the effect of building consumers anticipation in the months leading to a new product launch.  *Id*. ¶ 32.  Breaking with this cycle by delaying the further release of iOS 12 would cause immeasurable harm to the goodwill associated with iOS that Apple has spent over a decade building.  *Id*.; *see Quigley v. Guvera IP Pty Ltd.*, 10-cv-03569, 2010 WL 5300867, at *11 (N.D. Cal. Dec. 20, 2010) (balance does not favor plaintiff where injunction would "diminish [defendant's] goodwill and publicity"); *First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048, 1055 (N.D. Cal. 2005) (balance favored defendant who would "lose any goodwill and recognition" it earned in name).

*Second*, Apple already invested in videos, marketing, and training materials containing the MEMOJI mark, all of which will need to be recalled and replaced if an injunction is issued.  Knight ¶¶ 15–20, 30–31.  Its investment in developing goodwill in the MEMOJI mark will be lost and it will need to invest in a new campaign to make people aware of its new product name.  *Id*. ¶¶ 27, 30–31.  Numerous courts have found such losses weigh against injunctive relief.  *See Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 898 (9th Cir. 2004) (affirming denial of preliminary injunction given defendant's "significant investment in its Series and the advertising revenue that would be lost"); *Instant Media, Inc. v. Microsoft Corp.*, 07-cv-2639, 2007 WL 2318948, at *17 (N.D. Cal. Aug. 13, 2007) (rebranding cost weighs against injunction); *First Franklin*, 356 F. Supp. 2d at 1055 (balance "tips, if at all, in defendant's favor [where] defendant would be forced to change its website as well as countless promotional materials."); *Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254, 1264 (N.D. Cal. 2003) (injunction "generate[s] more hardship than it alleviates" where it would require "substantial reformatting of [defendant's] film" and "alteration of . . . promotional campaign").

*Third*, Apple cannot force existing iPhone X, iPhone XS, and iPhone XS Max mobile device users to download and install this new software, thus making it virtually impossible for Apple to comply with an injunction.  Knight ¶ 34.  In addition, for some indefinite time period, different Apple customers would have access to the same software feature, but under different names.  This would sow further frustration among consumers, particularly as consumers using the old software would not be able to find any support manuals regarding the Memoji software feature because all of those would have to be replaced.  *Id.*

*Fourth*, Social Tech's argument that "any 'hardship' Apple would suffer from changing the name is of Apple's own making," Pl. Br. at 22, ignores the fact that Apple in fact owns prior rights to the term "Memoji" and thus Apple is the senior user and free to use the mark.  Courts have held that where a party believes in good faith that its conduct is not infringing, a defendant's continued use of a mark will not tip the balance against it.  *See Alto Velo Racing Club v. Rouleur Sports Grp., LLC*, 15-cv-02144, 2015 WL 5462055, at *7 (N.D. Cal. Sept. 17, 2015) (where "[t]he nature of [plaintiff's] mark is in dispute . . . use alone does not cause the equities to favor [plaintiff]"); *Sutter Home Winery, Inc. v. Madrona Vineyards LP*, 05-cv-0587, 2005 WL 701599, at *14 (N.D. Cal. Mar. 23, 2005) ("reject[ing] plaintiff's attempt to characterize defendant's refusal to capitulate to its demands as evidence of bad faith" where "defendant has a reasonable, good-faith argument that it is entitled to use its . . . mark notwithstanding plaintiff's senior trademark rights.").

*Fifth*, the issuance of an injunction and the resulting disruption of consumers' enjoyment of iOS 12, also is likely to convince at least some consumers that Apple did something wrong, even though it went to great lengths to do everything right through its acquisition process.  Even if Apple is vindicated at the end of the litigation, its reputation would be irreparably harmed.  *See Downloadcard, Inc. v. Universal Music Grp., Inc.*, 02-cv-7710, 2002 WL 31662924, at *5 (S.D.N.Y. Nov. 26, 2002) (denying motion where it "would cause significant . . . commercial embarrassment").

*Finally*, contrary to Social Tech's suggestion, selecting and clearing a new name is no easy task, particularly as the name Memoji was selected specifically to create an association with Apple's pre-existing ANIMOJI mark.  Moreover, once the name is changed, as a practical matter, it will be permanent.  Knight ¶¶ 35–36.  Apple cannot delay iOS 12 downloads, change all of the necessary

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

software, marketing, and supporting materials, and invest resources reeducating the public, and then go back to the name Memoji if it succeeds on the merits. *Id.* For all practical purposes, granting Social Tech's motion means granting it final, irreversible relief, which further tips the balance of hardships in favor of Apple. *See Long Island-Airports Limousine Serv. Corp. v. New York Airport Servs. Corp.*, 641 F. Supp. 1005, 1012 (E.D.N.Y. 1986) (denying motion where defendant would have to re-brand, and then change its name again if vindicated, as "[t]he resulting confusion caused by two successive name changes would be understandably real").

## VI.     THE PUBLIC INTEREST IS SERVED BY DENYING THE INJUNCTION

It is not in the public interest to grant a preliminary injunction that would harm consumers more than it helps them. Apple uses its validly acquired MEMOJI mark as part of its new iPhone software, which users can only acquire from Apple and use in connection with Apple products. There is no reason to think consumers viewing Apple's software feature would think of Social Tech. On the other hand, the injunction Social Tech seeks would be highly disruptive to consumers who want their new iPhone models with the new iOS 12 software. Granting a preliminary injunction would deprive consumers of this new, innovative software product, which uses the MEMOJI mark only sparingly. Further, depriving consumers of iOS 12 means depriving them of the important security and performance features included in this software. Knight ¶ 32. The upgrade is not just for fun, it is also for consumer security. *See Alto Velo*, 2015 WL 5462055, at *7 ("[d]efendants' argument that an injunction would damage the public's interest in being able to purchase 'an innovative new product'" tipped this factor in favor of defendants).

## VII.    SOCIAL TECH SHOULD BE REQUIRED TO POST A BOND

While Apple believes that the Court need not reach the question of whether a bond is required—as Social Tech cannot meet its high burden to show that a preliminary injunction should issue in the first place—it is astonishing that Social Tech not only argues that it should get a draconian injunction but that it should also be excused from posting a bond because it is an "underfunded startup company." Br. at 25. That argument ignores the harm Apple will face if the Court later finds the injunction was improvidently granted. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("The district court may dispense with the filing of a bond when it concludes

there is *no realistic likelihood of harm* to the defendant from enjoining his or her conduct." (emphasis added)).  And when the only relief Apple would get under those circumstances is recovery of the bond, for Social Tech not to post a meaningful amount would be extraordinarily prejudicial to Apple.

Moreover, the cases Social Tech cites where the bond was excused are inapplicable, as they are not at all set in a commercial context like this one.  Rather, they involve citizen or non-profit actions against the government or a government agency, and no evidence of harm to the defendant if no bond, or only a very low bond, were posted.  *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ($50,000 security not an abuse of discretion where non-profit sued the U.S. Army Corps of Engineers alleging NEPA violations); *Barahona-Gomez v. Reno,* 167 F.3d 1228, 1233 (9th Cir. 1999) ($1,000 bond appropriate in class action against Attorney General challenging enforcement of immigration statutes); *People of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (no abuse of discretion in allowing non-profit to proceed without posting a bond in case against the Tahoe Regional Planning Agency); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1178 (N.D. Cal. 2009) (Medicaid recipients not required to post bond in class action concerning funding cuts in the Medi-Cal program).

In the one case that Social Tech cites that does not fit this fact pattern—a trademark case, *Moroccanoil, Inc. v. Zotos Int'l, Inc.*—the court set a "bond in the amount of $250,000."  230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017).  Thus, because Apple's harm from the issuance of an injunction is not only realistic but inevitable (for the reasons explained above), an appropriate bond is clearly warranted and further briefing regarding the appropriate bond should be granted. *See Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1080 (N.D. Ca. 1998) (holding that issuance of injunction was conditional upon plaintiff's posting bond of $1,630,000).

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be denied.

Dated: October 19, 2018                    Respectfully submitted,

                                           KIRKLAND & ELLIS LLP


                                           */s/ Dale M. Cendali*
                                           Dale M. Cendali (S.B.N. 1969070)

                                           Attorney for Defendant Apple Inc.

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**          **CASE NO. 3:18-cv-05945-VC**

## <u>CERTIFICATE OF SERVICE</u>

On October 19, 2018, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/ Dale M. Cendali*
Dale M. Cendali
