# EXHIBIT 9

# PUBLIC REDACTED VERSION

Page 1

1       UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3

4   SOCIAL TECHNOLOGIES LLC,        )
5              Plaintiff,           )
6         vs.                       ) Case No.
7   APPLE INC.,                     ) 3:2018-cv-05945
8              Defendant.           )
9   _____    )

10

11      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

13   VIDEOTAPED DEPOSITION OF APPLE INC. THROUGH 30(b)(6)
14              WITNESS KURT KNIGHT
15              Palo Alto, California
16              Friday, June 21, 2019

17

18

19

20

21  Reported by:
22  ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

Page 20

1  feature?
2       A.   Yes.
3       Q.   Is Apple's Memoji feature considered to be
4  augmented reality?
5            MS. TORRES:  Objection to form.
6            THE WITNESS:  I would not consider it an
7  augmented reality feature.
8  BY MR. HECHT:
9       Q.   What would you consider the Memoji
10 feature?
11           MS. TORRES:  Objection to form.
12           THE WITNESS:  If I were to describe what
13 I -- a description of the Memoji feature, I would
14 describe it as a way to create a personalized
15 animated emoji of yourself that you could share as a
16 still or a video clip as well as in other ways.
17 BY MR. HECHT:
18      Q.   Does Memoji feature allow users to create
19 a GIF selfie?
20           MS. TORRES:  Objection -- objection to
21 form.
22           THE WITNESS:  So functionally, yes, you
23 can use an image of yourself, a video of yourself,
24 and place a animated emoji image on top of that.
25 You could -- again, it could be a still or a video.

Page 21

1   If the -- what the actual video transport is, so
2   whether that's a GIF or some other format, I'm
3   not -- I'm not actually sure technically what the
4   transport is.  But functionally, yes.
5   BY MR. HECHT:
6       Q.   Okay.  Does Apple's Memoji feature allow
7   users to accessorize GIFs with static images?
8       A.   Yes.
9       Q.   Is that -- go ahead.
10      A.   With -- with the same caveat in terms of I
11  don't know if GIF is the actual format, but, again,
12  from a consumer standpoint, yes.
13      Q.   Is that true in iOS 12?
14           MS. TORRES:  Objection.
15  BY MR. HECHT:
16      Q.   When we're talking about the Apple Memoji
17  feature, I understand that there's a new version
18  that's coming out, the iOS 13.  For purposes of the
19  deposition, I just think we -- we're going to focus
20  on iOS 12, which is the current version.  Is that
21  fair?
22      A.   I am fine answering these sets of
23  questions in the context of iOS 12, please.  I'll --
24  I will say if I'm thinking of iOS 13, if you can say
25  that as well.  I mean I will do my best to use that

Page 39

1    Q.   When you say "working group," what do you
2  mean?
3    A.   The group that often is responsible for
4  features at Apple is a combination of an engineering
5  team that is coding the feature, the human interface
6  group, which defines the look and feel of the
7  feature, and product marketing.
8         And so by "working team," I mean that
9  group of -- of -- the cross-functional team that was
10 actually doing the day-to-day work of bringing the
11 feature into reality.
12   Q.   And how do you know that the working group
13 was using the phrase "Memoji"?
14        MS. TORRES:  Objection to form.
15        THE WITNESS:  So this answers the other
16 question, I believe, you want to get into, which is
17 my conversation with Ronak Shah.
18 BY MR. HECHT:
19   Q.   Okay.
20   A.   So I had also had conversations with Ronak
21 in that [REDACTED] time frame starting to talk about
22 potential names.
23   Q.   And Ronak told you that other people were
24 referring to it as "Memoji"?
25   A.   And so at that time, Ronak highlighted

Page 40

1    Memoji as a name that both he liked, as well as had
2    favor by the other people in that working group.
3         Q.   He had favored the Memoji name, as well?
4         A.   That was a name.  Not necessarily the only
5    name, but a name that he liked at that time, yes.
6         Q.   Do you remember any of the other names
7    offhand that were being considered for this feature?
8         A.   So I -- I can't -- in specifically that
9    ▉▉▉ time frame?
10        Q.   Yes.
11        A.   I'm not -- I -- I remember other names
12   that were discussed.  I'm not certain if they were
13   ones that we were discussing in ▉▉▉ at that time.
14        Q.   By ▉▉▉▉▉, were you tasked with naming
15   the feature?
16        A.   Say that one more time to make sure.
17        Q.   In ▉▉▉▉▉, were you tasked with naming
18   the feature that would become the Memoji feature?
19        A.   I -- it was part of my job responsibility,
20   but I was not specifically tasked.  No one ever told
21   me, "Go and find a name."
22        Q.   In ▉▉▉▉▉ or prior, did you send any
23   emails to anyone regarding naming the feature that
24   would be called Memoji?
25        A.   I -- I don't -- I don't know if I did or

Page 58

1    bullet says, "App Store supported in text."
2             What does that mean?
3        A.   Give me a second.  I --
4        Q.   Sure.
5        A.   -- I don't immediately know.  Give me a
6    second to think about it.
7             (Pause while witness peruses document.)
8        A.   I -- I don't know.
9        Q.   Do you think it relates to Memoji?
10       A.   I do not believe it relates to Memoji.
11       Q.   Okay.  Did you have a brainstorming
12   session for the software feature that was to become
13   named Memoji?
14       A.   There was a brainstorming session for that
15   name, yes.
16       Q.   Was there more than one brainstorming
17   session?
18       A.   I only remember one brainstorming session.
19       Q.   Do you remember when that brainstorming
20   session was?
21       A.   It would have been generally around this
22   time frame.  If this was sent ▮▮▮▮▮▮▮, I would
23   imagine it would be -- I would guess it would be a
24   little bit following this.
25       Q.   Was it in person?

Page 59

1    A.   Yes.  I was not at the meeting, but this
2  was an -- an in-person brainstorming session.
3    Q.   Do you know who attended that meeting?
4    A.   The invitee list would have been my team.
5  But I'm not sure who specifically attended.
6    Q.   How did you know that they -- that those
7  people had attended a brainstorming meeting?
8    A.   I remember working with -- a meeting with
9  Ronak Shah prior to the meeting to discuss naming
10 and the need for the brainstorming meeting.  And I
11 had wanted to attend the brainstorming meeting but
12 was not able to.  And then I remember discussing
13 with Ronak post the meeting as well.  So I was --
14   Q.   Okay.  So let's start with the meeting
15 with Ronak before the meeting.  What did you talk
16 about?
17   A.   The specifics that I can remember was
18 going over where his -- I remember seeing his
19 current thinking on naming, which I -- I don't
20 remember the specific list.  And I remember talking
21 about making sure that we set up a brainstorming
22 meeting to further flush out ideas.
23   Q.   Did you talk to legal before that
24 brainstorming meeting?
25   A.   I do not believe we did, about the Memoji

Page 60

1  mark at least.
2     Q.   Yes.
3     A.   Right.
4     Q.   Do you -- do you recall what you spoke
5  with Ronak after the brainstorming meeting about?
6     A.   It would have been to go over the list of
7  names and thoughts that they had collected during
8  that meeting.
9     Q.   Do you have any recollection of that
10 conversation?
11    A.   Not more specifically than remembering
12 that we had the meeting.  I don't -- I don't
13 remember --
14    Q.   You don't --
15    A.   I mean -- go ahead.  Ask your question.
16    Q.   Do you recall whether Memoji was the front
17 runner of the naming discussed?
18    A.   I -- I believe Memoji was the front runner
19 at that time.
20    Q.   After that meeting did you talk to legal?
21    A.   At some point after that, yes.
22    Q.   And who did you talk to at legal regarding
23 the Memoji name?
24    A.   Tom LaPerle.
25    Q.   And what did you say to Tom LaPerle?

Page 76

1    foundation.
2            THE WITNESS:  So, again, I wasn't directly
3    involved with the launch of the Animoji feature, so
4    I'm not deeply familiar with everything that went
5    there.
6            But as with any top feature, there is a
7    range of marketing activities that we do and
8    continue to have ongoing in terms of how we
9    communicate about our features.
10   BY MR. HECHT:
11       Q.   What do those activities include?
12       A.   From web pages to ongoing highlights as
13   part of press tours, and, you know, potentially
14   billboards and tweets, television advertisements are
15   all possible things.  And I'm sure that is far from
16   an exhaustive list.
17       Q.   Would you have been involved with those
18   types of activities for Memoji?
19       A.   So communications around product launch,
20   such as press releases, communication to sales team,
21   web keynote press releases, I would have been
22   actively involved in.
23            And I believe, to the extent that we did
24   any TV advertising or billboards, I was also aware
25   of those.  But those were not -- those are not

```
                                                    Page 94
 1   BY MR. HECHT:
 2        Q.   Do you recognize this email?
 3        A.   Yes, I do.
 4        Q.   And what is this email?
 5        A.   This is Brian Croll's response to the
 6   email response we just reviewed by Scott Miller.
 7        Q.   And it leads with, "Here's my take on what
 8   a video would solve."
 9             What -- what was this video that he's
10   referring to, or potential video?
11        A.   He is referring to the request to have a
12   video for Screen Time.
13        Q.   This is not related to --
14        A.   Not related to Memoji.
15                  (Exhibit 147 was marked for
16                   identification and attached
17                   hereto.)
18   BY MR. HECHT:
19        Q.   Do you recognize Exhibit 147?
20        A.   Yes.
21        Q.   This is an email from you to Craig
22   Federighi, cc'ing other individuals.  Is this the
23   email that you had sent on █████████████ at 1834?
24        A.   I believe it is.
25        Q.   On the top email you say that ████████
```

```
                                                    Page 95
 1      ███████  is what we landed on the last time we
 2   discussed."
 3            What did you mean by that?
 4      A.    So I think at this point we had -- we were
 5   fairly settled on our naming sort of strategy, which
 6   is Memoji remained our favorite choice if we got
 7   clearance, and ████████████ was the name that we
 8   were planning to use if Memoji was not cleared.
 9      Q.    Did you bold the Memoji new name in the --
10   I guess the inline email?
11      A.    I did not.
12      Q.    Are any of the people on this email
13   attorneys?
14      A.    No, they're not.
15      Q.    Craig Federighi is not an attorney; is
16   that right?
17      A.    That is correct.
18      Q.    Scott Miller is not an attorney; is that
19   correct?
20      A.    That is correct.
21      Q.    Greg Joswiak is not an attorney?
22      A.    That is correct.
23      Q.    Brian Croll is not an attorney?
24      A.    That is also correct.
25      Q.    Did you have any -- were you ever told
```

Page 112

1  the names the way that we -- we currently were
2  referencing.
3          MS. TORRES: Counsel, I'm going to insert
4  a belated objection to form. I -- I think you
5  misspoke in your question.
6  BY MR. HECHT:
7      Q.  I think we both understood the Q and A.
8  I'm going to move on to the next question.
9          Then you ask in this email, "Do we want to
10 ask about the performance -- about performance
11 improvements or ▮▮▮▮▮▮▮▮▮▮▮▮
12         Was ▮▮▮▮▮▮▮▮▮▮▮▮ the marketing name at
13 that point on ▮▮▮▮▮▮▮▮▮▮ for the software
14 feature?
15     A.  As answered before, ▮▮▮▮▮▮▮▮▮▮▮ was
16 our plan B if we couldn't clear the Memoji name.
17         And at this time, we hadn't gotten the
18 final clearance on the Memoji name yet.
19     Q.  So at this point, you were unsure about
20 the final name for that software feature that would
21 become known as Memoji?
22     A.  That is correct.
23     Q.  And then on ▮▮▮▮▮▮▮, then, the first
24 page, your email, second in the chain says, "The
25 official name for ▮▮▮▮▮▮▮▮▮▮▮ is Memoji."

Case 3:18-cv-05945-VC   Document 123-9   Filed 10/30/19   Page 14 of 16

Page 113

1  Was that -- how did you come to know that
2  the official name would be Memoji?
3     A.  We would have received clearance from our
4  legal team by that point.
5     Q.  And did you review a final survey document
6  from Jed by ▮▮▮▮▮▮▮▮?
7        MS. TORRES:  Objection to form.
8        THE WITNESS:  I don't know.  I do not
9  remember reviewing another version, but I may have.
10           (Exhibit 151 was marked for
11            identification and attached
12            hereto.)
13 BY MR. HECHT:
14    Q.  Have you seen these results before?
15    A.  I reviewed these briefly yesterday during
16 preparation.
17    Q.  Had you seen these results previously to
18 yesterday?
19    A.  I do not believe I had.
20    Q.  Do you know when this survey was
21 performed?
22    A.  I do not know.
23    Q.  Is this the same format as you -- scratch
24 that question.
25        Do survey results generally come in a pdf

212-267-6868                www.veritext.com                516-608-2400

Page 149

1  DECLARATION
2
3       I hereby declare I am the deponent in the within
4  matter; that I have read the foregoing transcript and
5  know the contents thereof; and I declare that the same
6  is true of my knowledge except as to the matters which
7  are therein stated upon my information or belief, and
8  as to those matters, I believe them to be true.
9       I declare under the penalties of perjury
10 under the laws of the United States that the
11 foregoing is true and correct.
12
13      This declaration is executed this __24__ day
14 of _____July_____, 2019, at
15 _____Cupertino_____, California.
16
17
18      _____
19                KURT KNIGHT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

SOCIAL TECHNOLOGIES LLC, a Georgia limited liability company,

    Plaintiff,

vs.

APPLE INC., a California corporation,

    Defendant.

CASE NO.: 3:18-cv-05945-VC

**ERRATA FOR JUNE 21, 2019 DEPOSITION OF KURT KNIGHT**

| PAGE:LINE | CHANGE | REASON |
|---|---|---|
| 37:2 | Change "Alan Dai" to "Alan Dye" | TE |
| 37:5 | Change "Alan Dai" to "Alan Dye" | TE |
| 37:6 | Change "Alan Dai" to "Alan Dye" | TE |
| 37:21 | Change "Alan Dai" to "Alan Dye" | TE |
| 37:23 | Change "Alan Dai" to "Alan Dye" | TE |
| 37:25 | Change "Alan Dai" to "Alan Dye" | TE |
| 38:17 | Change "Alan Dai" to "Alan Dye" | TE |
| 42:10 | Change "Alan Dai" to "Alan Dye" | TE |
| 42:11 | Change "Alan Dai" to "Alan Dye" | TE |
| 43:18 | Change "Alan Dai's" to "Alan Dye's" | TE |
| 46:4 | Change "Alan Dai" to "Alan Dye" | TE |

*TE = Transcription Error*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __25__ day of July 2019 at ___Cupertino___, California.

Kurt Knight