# EXHIBIT 4

# PUBLIC REDACTED VERSION

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3    ---------------------------*

4    SOCIAL TECHNOLOGIES LLC,

5                 Plaintiff,        Case No.

6        vs.                        CV 18-05945-VC

7    APPLE INC.,

8                 Defendant.

9    ---------------------------*

10      HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

11           ORAL AND VIDEO DEPOSITION OF

12                 SAMUEL E. BONET

13                 July 3, 2019

14               New York, New York

15                  9:12 a.m.

16

17

18

19

20

     Reported by:

21   Josephine H. Fassett, RPR, CCR

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1   being warned that willful false statements and the

2   like are punishable by fine or imprisonment or

3   both under 18 U.S.C. Section 1001, and that such

4   willful false statements and the like may

5   jeopardize the validity of the application or any

6   registration resulting thereon."  Do you see that?

7        A.   I do, yes.

8        Q.   And you understood that when you signed

9   it, correct?

10            MR. HECHT:   Objection.

11        A.   Yes.

12        Q.   Did Social Tech conduct a trademark

13   search prior to filing this application?

14        A.   Yes.

15        Q.   Prior to signing Social Tech's

16   application for the Memoji design mark, did you

17   search the PTO website to see if anyone had

18   previously applied to register a mark containing

19   the word Memoji?

20        A.   Yes.

21        Q.   Did you do that personally?

22        A.   Yes.

23        Q.   Do you have copies of those searches?

24        A.   I do not.

25        Q.   What did you find when you searched the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 95

1   PTO website to see if anyone had applied to

2   register a mark with the word Memoji?

3        A.   Lucky Bunny's abandoned application.

4        Q.   Anything else?

5        A.   I don't think so.

6        Q.   Prior to signing and submitting Social

7   Tech's MEMOJI design mark application, did Social

8   Tech do any Google searches for the word Memoji?

9        A.   Yes.

10       Q.   Did you do that personally?

11       A.   Yes.

12       Q.   What came up in those Google searches?

13       A.   Lucky Bunny's app.

14       Q.   Was the Lucky Bunny app the first thing

15  that came up in the -- in your Google search?

16       A.   I don't quite recall.

17       Q.   Is it fair to say it was on the first

18  page?

19            MR. HECHT:  Objection.

20       A.   Yes.

21       Q.   And it may have been the first result;

22  isn't that true?

23            MR. HECHT:  Objection.

24       A.   I'm not sure, I'd be speculating.

25       Q.   Did you keep copies of any of the Google

1    searches you did?

2         A.   I did not.

3         Q.   And when you did your Google searches

4    and you saw Lucky Bunny's mobile app come up, did

5    you also see references to Howie Mandel?

6              MR. HECHT:  Objection.

7         A.   I don't recall that.

8         Q.   You don't recall one way or the other?

9         A.   I don't recall at all.

10         Q.   Prior to signing your declaration in

11    support of Memoji's -- prior to signing your

12    declaration in support of Social Tech's MEMOJI'S

13    design app trademark application, were you aware

14    that Howie Mandel had been promoting Lucky Bunny's

15    app?

16         A.   I was not aware of that.

17         Q.   Did you do a search on the Apple App

18    Store to see if anyone had an app using the term

19    Memoji prior to submitting Social Tech's trademark

20    application?

21         A.   I did.

22         Q.   What did you find?

23         A.   Lucky Bunny's app.

24         Q.   Did you find any other apps that used

25    the word Memoji?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 98

1    Q.   What uses of Memoji were you aware of at

2    the time Social Tech filed its intent-to-use

3    trademark application for the Memoji design mark

4    on April 1, 2016?

5    A.   I'm not completely clear on what you

6    mean by "uses."

7    Q.   Okay.  What information did you have of

8    people who had used the mark Memoji before you

9    filed your application on April 1, 2016, for the

10   Memoji design mark?

11        MR. HECHT:  Objection to form.

12   A.   The only memoji I was aware of was Lucky

13   Bunny's.

14   Q.   And Lucky -- and you became aware of

15   Lucky Bunny because it came up in your searches;

16   is that right?

17   A.   Yes.

18        (Declaration of Samuel Bonet in

19        Support of Plaintiff's Motion for

20        Preliminary Injunction marked as Bonet

21        Exhibit 228, as of this date.)

22   BY MS. CENDALI:

23   Q.   I'm handing you a document that has been

24   marked as Exhibit 228.

25        Is Exhibit 228 a declaration you

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

1    had filed a trademark application, you realized

2    that that application had contact information for

3    Lucky Bunny, right?

4              MR. HECHT:  Objection.

5         A.   I would assume it would have contact

6    information if it looks like my application, yes.

7         Q.   Did you ever do anything to pick up the

8    phone and call Lucky Bunny and ask it?

9         A.   I did not.

10        Q.   Excuse me.

11             Prior to submitting Social Tech's

12   trademark application for the Lucky Bunny --

13   excuse me.

14             Prior to submitting Social Tech's

15   trademark application for the Memoji design mark,

16   did Social Tech do anything to reach out to Lucky

17   Bunny to find out if it was still using the mark?

18             MR. HECHT:  Objection.

19        A.   No.

20        Q.   Did Social Tech do anything to contact

21   Lucky Bunny and ask about the number of downloads

22   it had?

23        A.   No.

24        Q.   So you're aware now that -- am I correct

25   that Social Tech is now aware that Lucky Bunny

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 108

```
 1        A.    I did.
 2        Q.    Okay.  So you went to the Apple App
 3   Store and saw that the app was still available,
 4   correct?
 5        A.    Correct.
 6        Q.    Prior to submitting your trademark
 7   application for the Social Tech Memoji design app,
 8   did you attempt to download the Lucky Bunny app?
 9        A.    I did.
10        Q.    And were you able to download it?
11        A.    I was.
12        Q.    Did you discuss this with Mr. Long?
13              MR. HECHT:  Objection to form.
14        A.    I don't recall if I told him or not.
15        Q.    Well, prior to submitting Social Tech's
16   MEMOJI design app, did you have any conversations
17   with Mr. Long about Lucky Bunny?
18        A.    I'm sure we discussed it briefly, yes.
19        Q.    What was said?
20        A.    That they had an abandoned application,
21   and in conjunction with a lack of updates and a
22   lack of promotion, all of those things together
23   meant that they weren't using it.
24        Q.    Did you ever discuss with Mr. Long
25   whether it would be a good idea to call Lucky
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 111

1  and no updates and no media presence.

2       Q.   Are you aware that you can have

3  trademark rights even without a trademark

4  registration, sir?

5            MR. HECHT:  Objection.

6       A.   I'm not an attorney.

7       Q.   Have you heard the term common law

8  rights?

9       A.   I have.

10      Q.   Were you aware of that term before

11 Social Tech filed its trademark application for

12 its MEMOJI design mark?

13      A.   I was not aware, no.

14      Q.   Did you attempt to download the

15 Lucky Bunny app on more than one occasion?

16      A.   I did.

17      Q.   Why?

18      A.   I downloaded it a second time to see if

19 it would open up on my phone, my current phone --

20 not my current phone -- sometime last year.

21      Q.   When was that?

22      A.   I don't recall exactly when.

23      Q.   Was this after Apple's announcement on

24 June 4 of 2018 of its Memoji feature?

25      A.   I believe so, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 112

1      Q.   So when you downloaded the Memoji app on

2  your phone at the time you filed Social Tech's

3  trademark application for the MEMOJI design app,

4  did you keep the Lucky Bunny app on your phone?

5           MR. HECHT:  Objection to form.

6      Q.   Excuse me -- yeah.  Just to be clear.

7           When you downloaded the Lucky Bunny

8  Memoji app on your phone originally, did you keep

9  it on your phone or did you delete it?

10     A.   I believe I deleted it.

11     Q.   So did you download it again?

12     A.   A second time, yes.

13     Q.   And was that after Apple's announcement?

14     A.   I believe so, yes.

15     Q.   And was that before you filed your

16  September 27, 2018, declaration to the Court?

17     A.   I don't recall exactly when it was.

18     Q.   Well, before you filed your lawsuit

19  against Apple, did you do anything to look to see

20  if the Lucky Bunny app was still available?

21     A.   Before we filed the lawsuit, did I look

22  to see if the app was still on the App Store?

23     Q.   Yes.

24     A.   I did look, yes.

25     Q.   And you saw that it was, right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1           nonresponsive.

2      BY MS. CENDALI:

3           Q.    When you downloaded the Lucky Bunny app,

4      it didn't crash, did it?

5                 MR. HECHT:   Objection.

6           A.    I don't recall if it crashed or not.

7           Q.    Well, when you downloaded the

8      Lucky Bunny app originally, did you open it?

9           A.    The initial time?

10          Q.    Yes.

11          A.    I did open it, yes.

12          Q.    Yeah.  And when you downloaded it the

13     second time, after Apple's June 4th announcement,

14     did you open it?

15          A.    I believe I did, yes.

16          Q.    Did you ever have any discussions with

17     Lucky Bunny at any time?

18          A.    No.

19          Q.    And to be clear, did anyone on behalf of

20     Social Tech ever have any communications with

21     Lucky Bunny at any time?

22          A.    Not to my knowledge.

23          Q.    Okay.  So at the time you filed Social

24     Tech's application for its MEMOJI design mark, you

25     understood the Lucky Bunny app was available on

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

1    as reflected on Bates numbered pages APPLE_147 and

2    148?

3         A.   You're saying I knew this existed when I

4    filed my application?

5         Q.   Yes.

6              MR. HECHT:  Objection.

7         A.   Yes.

8         Q.   Okay.  And you understood that

9    Lucky Bunny was claiming that it was already using

10   the Memoji mark for its computer application

11   software for mobile phones, right?

12             MR. HECHT:  Objection.

13        A.   When they filed their application they

14   claimed to have been using it already.

15        Q.   Okay.

16        A.   Yes.

17             (USPTO File Wrapper for Lucky Bunny's

18             Second Memoji Trademark Application, Bates

19             APL-STECH_00000287 to APL-STECH_00000382,

20             marked as Bonet Exhibit 231, as of this

21             date.)

22   BY MS. CENDALI:

23        Q.   Now, let's take a look at what's been

24   marked as Exhibit 231.

25             Is Exhibit 231 the USPTO file wrapper

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 123

1    for Lucky Bunny's second Memoji trademark

2    application?

3         A.    This appears to be that application,

4    yes.

5         Q.    And I note that on the first page it

6    says that the application filing date was April 3,

7    2017.  Do you see that?

8         A.    Yes.

9         Q.    When did you become aware of Lucky

10   Bunny's second trademark application?

11        A.    I'm not sure, it may have been previous

12   counsel.

13        Q.    You were aware of Lucky Bunny's second

14   trademark application by the time you filed your

15   September 27, 2018, declaration to the Court in

16   support of Social Tech's preliminary injunction

17   motion, correct?

18             MR. HECHT:  Objection.

19        A.    I believe I knew about it at that time,

20   yes.

21        Q.    And you understood that Lucky Bunny was

22   continuing to claim that its Memoji mark was

23   already in use and that it had an October 1, 2014,

24   first-use date, correct?

25        A.    I'm sorry?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 124

1        Q.    Sure.

2        A.    Please repeat.

3        Q.    And when you saw this second Lucky Bunny

4    trademark application, you understood that, as of

5    the date of filing that application on April 3,

6    2017, Lucky Bunny was continuing to claim that its

7    Memoji mark was in use and had an October 1, 2014,

8    first-use date, right?

9        A.    Based upon this, it appears that that --

10   yes.

11       Q.    Right.  And that was what you

12   understood, right?

13       A.    Yes.

14       Q.    And would you agree that Lucky Bunny's

15   filing of its second trademark application on

16   April 3, 2017, indicated that, at least as of that

17   time, it did not intend to abandon any trademark

18   rights it had to the word memojis?

19            MR. HECHT:  Objection to form.

20       A.    I don't know whether they chose to

21   abandon it or not.

22       Q.    I'm asking you whether you would agree

23   that the fact that Lucky Bunny filed this second

24   trademark application on April 3rd of 2017

25   indicated that they were still attempting to claim

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 125

1    trademark rights as of that date.

2           MR. HECHT:  Objection.

3      A.    As of that exact date, I would have -- I

4    would assume so.

5      Q.    Yeah.  People don't normally file

6    trademark applications if they're trying to

7    abandon a mark, correct?

8           MR. HECHT:  Objection.

9      A.    I don't know that.

10     Q.    Well, when you filed your second

11   Hellojis trademark application, were you

12   attempting to abandon your Hellojis trademark

13   rights?

14          MR. HECHT:  Objection.

15     A.    No, because I did it while the other one

16   was still live.

17     Q.    Yeah.  And would you agree that when

18   someone looked at the PTO records and saw that you

19   had -- that Social Tech had filed a second

20   trademark application for the mark Hellojis, that

21   would indicate to researchers that Social Tech was

22   claiming trademark rights?

23          MR. HECHT:  Objection.

24     A.    Yes, I would agree with that.

25     Q.    Okay.  Now, so when you -- when you were

Page 131

1   than October of 2014 relating to Mr. Anthony's

2   Memoji-Emoji Yourself app, correct?

3        A.   Yeah, when I saw the Facebook page the

4   first time, there was nothing related to that app

5   since October of 2014.

6        Q.   Okay.  So let's talk some more about the

7   development of Social Tech's MEMOJI app.

8             I believe you said that the initial idea

9   for the Social Tech's MEMOJI app was in 2016; is

10  that right?

11       A.   Yes.

12       Q.   What was done in 2016 to develop the

13  Social Tech MEMOJI app?

14       A.   The physical construction of the app or

15  anything related to it at all?

16       Q.   Well, was any work done on the physical

17  construction of the app in 2016?

18       A.   There was no coding done, no.

19       Q.   Okay.  So what else was done in 2016, if

20  anything, regarding developing the Social Tech

21  MEMOJI app?

22       A.   The creation of promotional material,

23  prototypes, samples, business plan, projections.

24       Q.   Isn't it true that Social Tech

25  unsuccessfully pitched its Memoji app to investors

Page 132

1    in mid-2016?

2              MR. HECHT:  Objection.

3         A.   Yes.

4         Q.   Isn't it true that no investors were

5    interested?

6              MR. HECHT:  Objection.

7         A.   I don't know if they were interested,

8    but they didn't pull the trigger for some reason.

9         Q.   Well, if -- none of the investors you

10   spoke to decided to invest, correct?

11        A.   Correct.

12        Q.   And did any of them explain why they

13   decided not to invest?

14        A.   I don't recall, no.

15        Q.   Isn't it true that after the investors

16   declined to invest, no further work was done on

17   the proposed Social Tech MEMOJI app until after

18   Apple's announcement?

19             MR. HECHT:  Objection.

20        A.   We maintained promotional -- a

21   promotional presence on the website.  And in the

22   late spring of 2018 after Hellojis -- what we

23   thought was in a good place -- Justin and I began

24   discussing Memoji on how to build it.

25        Q.   Do you -- when you said that you thought

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

1  augmented reality but, to the best of my

2  knowledge, that's the only one, the only thing.

3      Q.   What code, if any, was written with

4  regard to the Social Tech Memoji prospective app

5  in 2017?  Nothing, right?

6          MR. HECHT:  Objection to form.

7      A.   2017, there was no code written.

8      Q.   Essentially no work was done on the

9  Social Tech MEMOJI app in 2017, right?

10         MR. HECHT:  Objection.

11     A.   There was no code written, no.

12     Q.   And no new marketing or promotion or

13  nothing else was done, right?

14         MR. HECHT:  Objection.

15     A.   I didn't make any new content, no.

16     Q.   And prior to Apple's announcement of its

17  Memoji feature on June 4th of 2018, had any code

18  been written for Social Tech's MEMOJI app?

19     A.   That would have been a question for

20  Justin.  I'm not completely sure.

21     Q.   You don't know of any, right?

22         MR. HECHT:  Objection.

23     A.   Justin would know that.  I don't -- I

24  don't know what he would have done after we began

25  talking about it.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 135

1      Q.   Isn't it true that you didn't contract

2   with FlexDev to develop the Social Tech Memoji app

3   until after Apple's June 4, 2018, announcement?

4           MR. HECHT:  Objection.

5      A.   Well, at the time we had a pretty good

6   business relationship, so we didn't feel the need.

7      Q.   Do you have any documents showing that

8   you -- and I remind you you're under oath -- that

9   you, in fact, spoke to Mr. Grant and had him begin

10  work on Social Tech's MEMOJI app prior to June 4th

11  of 2018?

12          MR. HECHT:  Objection.

13     A.   I don't have any documents, no.

14     Q.   Okay.  You are the 30(b)(6) witness for

15  Social Tech on the development of Social Tech's

16  MEMOJI app, so I ask you again:  As the 30(b)(6)

17  witness for Social Tech, had any code been written

18  for the Social Tech MEMOJI app prior to Apple's

19  announcement on June 4th of 2018?

20          MR. HECHT:  Objection.

21     A.   I would have to ask Justin, I really

22  don't know.

23     Q.   So you're not prepared to testify as the

24  30(b)(6) witness for Social Tech as to whether

25  code had been written prior to that date?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 136

1          MR. HECHT:  Objection.

2      A.   I am prepared.

3      Q.   So what is your answer, yes or no?

4          MR. HECHT:  Objection.

5      Q.   Had code been written -- and I remind

6  you you're under oath -- prior to June 4, 2018,

7  for Social Tech's MEMOJI app?

8      A.   I'm not sure.  If I had to guess,

9  probably not.

10     Q.   Now, on May 21st of 2018, you were

11 contacted from someone inquiring about the Memoji

12 name, right?

13     A.   Yes.

14     Q.   And going back to your declaration in

15 support of the preliminary injunction motion,

16 Exhibit 228, that should be in front of you.

17          Turning to Paragraph 9, you wrote:  On

18 May 21, 2018, an unknown person -- but now

19 believed to be acting at the direction of Apple

20 Inc. -- left a message with Social Tech inquiring

21 about Memoji.  Do you see that?

22     A.   Yes.

23     Q.   Did the person give his name?

24     A.   On the voice mail he left a name, but I

25 didn't -- I could not make it out.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 140

1    inquiry on behalf of Apple?

2         A.    At the time, no.

3         Q.    And when did -- you keep saying "at the

4    time," when did that thought come to you?

5         A.    After I saw Apple's announcement.

6         Q.    Isn't it true that you -- or let me just

7    be clear.

8              So you didn't receive this call and then

9    call Justin Grant and say, "Hey, we've got to

10   start working on this app.  Apple might be

11   interested in buying it"?

12             MR. HECHT:  Objection.

13        A.    I don't recall.

14        Q.    Well, you claim, although you don't have

15   any documents, that you spoke to Mr. Grant about

16   developing the Social Tech MEMOJI app.  Was it

17   after May 21, 2018?

18        A.    I really don't remember the exact date.

19        Q.    So, again, you are the Social Tech

20   30(b)(6) witness on the development of the Social

21   Tech MEMOJI app.  I ask you again:  Isn't it true

22   that your alleged conversation with Mr. Grant

23   about developing the Social Tech MEMOJI app was

24   after you received the call from Mr. Yarborough on

25   May 21, 2018?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

1          MR. HECHT:  Objection.

2     A.   I'm really not sure when it happened.  I

3  don't want to say exactly -- I don't want to

4  speculate.

5     Q.   So you're not prepared to testify on

6  that subject, correct?

7          MR. HECHT:  Objection.

8     A.   That would have been completely from

9  memory.  I really don't know.  I'm not sure.

10    Q.   But you knew as of -- but I'm correct

11 that as of May 21, 2018, no code had been written

12 for Social Tech, correct?

13         MR. HECHT:  Objection.

14    Q.   For Social Tech's MEMOJI app, correct?

15    A.   Probably not.

16         (Social Technologies LLC's GitHub

17    Account for Memoji IOS Development, Bates

18    SocialTech_0000887, marked as Bonet Exhibit

19    233, as of this date.)

20         (Social Technologies LLC's GitHub

21    Account for Memoji Android Development,

22    Bates SocialTech_0000888, marked as Bonet

23    Exhibit 234, as of this date.)

24 BY MS. CENDALI:

25    Q.   I'm handing you two documents that have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 144

1     Q.   Okay.  Would the actual documents

2  reflected in this GitHub account show when work

3  had been done on the writing code for the Memoji

4  Social Tech account?

5          MR. HECHT:  Objection.

6     A.   They would reflect the first time they

7  were uploaded to this account.

8     Q.   Okay.

9     A.   To the best of my knowledge.

10     Q.   And isn't it true that the first time,

11  according to Exhibit 233, work was uploaded to

12  GitHub account was June 10, 2018?

13     A.   The first time it was uploaded, yes.

14     Q.   Okay.  And isn't it true -- and you

15  don't know whether any work was done prior to that

16  time; is that right?

17     A.   I mean, logic would state that there was

18  work done before that because it had to be written

19  somewhere, but I couldn't -- the exact dates,

20  that's a question for Justin.

21     Q.   Well, you're the 30(b)(6) witness for

22  Social Tech on the Social Tech's development of

23  the -- the app.  Am I correct that you have no

24  information indicating whether code was written --

25  how long code was written, if at all, prior to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1       Q.   And isn't it true that later after this

2  lawsuit was started he forwarded it to you again

3  on November 27, 2018?

4            MR. HECHT:  Objection to form.

5       A.   It appears he did.

6       Q.   Yeah.  And isn't it true that May 22,

7  2018, was the day after you received the call and

8  spoke to Mr. Yarborough?

9       A.   It is.

10      Q.   So was Social Tech aware of Apple's

11 June 4th announcement regarding Apple's new Memoji

12 feature?

13      A.   Was Social Tech aware of -- I was

14 watching the conference, yes.

15      Q.   Okay.  So from the very time you watched

16 the conference, you heard that Apple had announced

17 the new Memoji feature for its phones, correct?

18      A.   Correct.

19      Q.   After you heard this, did you text or

20 email Mr. Grant or Mr. Long about it?

21           MR. HECHT:  Objection to form.

22      A.   I don't recall if I texted or emailed

23 them.  I did call.

24      Q.   What did you say when you called them?

25      A.   I'm not -- I don't know the exact words

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 161

1    A.   I did know that the process had to be

2  completed, yes.

3    Q.   And that process indicated that you had

4  to file a statement of use in order to obtain the

5  registration for the Memoji design app, correct?

6          MR. HECHT:  Objection.

7    A.   Yes.

8    Q.   Now, isn't it true that Social Tech

9  contacted FlexDev to ask for its assistance in

10  pursuing a claim against Apple?

11          MR. HECHT:  Objection to form.

12    A.   I don't believe that's how the

13  conversation went.

14    Q.   Isn't it -- sorry, go ahead.

15    A.   Yeah, I'm not -- I don't remember

16  exactly how the conversation went, but he

17  mentioned knowing an attorney, so that was the

18  introduction to previous counsel.

19    Q.   So Mr. Grant introduced you to Mr. Dee;

20  is that right?

21    A.   Yes.

22    Q.   And so when you first contacted

23  Mr. Grant, you talked to him about suing Apple,

24  right, and he put you in touch with an attorney?

25          MR. HECHT:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 162

1      A.    I don't remember if we said sue Apple or

2    not.  He put me in touch with an attorney, yes.

3      Q.    And he put you in touch with an attorney

4    because you guys were discussing Apple's Memoji

5    announcement, right?

6      A.    We were discussing protecting our

7    rights.

8      Q.    Yeah.  And isn't it true that you

9    discussed with Mr. Grant that you thought -- that

10   Social Tech pursuing a claim against Apple would

11   make you all a lot of money?

12           MR. HECHT:  Objection.

13     A.    Potential recovery from something like

14   this would be substantial, I would imagine.

15     Q.    And isn't it true you discussed with

16   Mr. Grant that, if you could pursue a claim

17   against Apple, you could all get rich?

18           MR. HECHT:  Objection to form.

19     A.    I don't remember the exact wording of

20   the conversation.

21     Q.    But words to that effect were said by

22   you to Mr. Grant; isn't that true?

23           MR. HECHT:  Objection to form.

24     A.    I'm not a hundred percent sure.

25     Q.    Isn't it -- you're the 30(b)(6) witness

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 164

1    BY MS. CENDALI:

2         Q.   I'm not asking what you do in general.

3    I'm asking you whether it is, in fact, true that

4    you spoke to Mr. Grant and said, "We have the

5    opportunity to pursue a claim against Apple and

6    make a lot of money," yes or no?

7              MR. HECHT:   Objection.

8         A.   I might have said that.

9              (Email, Bates FlexDevGrant_0176,

10        marked as Exhibit 237, as of this date.)

11   BY MS. CENDALI:

12        Q.   Let me show you what's been marked as

13   Exhibit 237, a document bearing the Bates number

14   FlexDev_176, an email exchange from you using your

15   info@socialtechnologiesllc.com email address to

16   Justin Grant, subject Memoji Functionality

17   Description, dated June 6, 2018.

18             Do you recognize this as an email you

19   sent Mr. Grant?

20        A.   Yes.

21        Q.   And this document shows the Goods

22   description in Social Tech's trademark application

23   for its Memoji design mark, correct?

24             MR. HECHT:   Objection.

25        A.   I believe so, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 165

1      Q.   And certain of the goods are

2   highlighted -- are highlighted in red, correct?

3      A.   Correct.

4      Q.   Did you do that highlighting?

5      A.   I might have.  I don't remember.

6      Q.   Did you do -- highlight some of the

7   Social Tech description of the goods and services

8   for its Memoji design app because you wanted to

9   instruct Mr. Grant to design the Memoji app to

10  meet these requirements?

11          MR. HECHT:  Objection.

12     A.   It looks like that.

13     Q.   Now, and this was two days after the

14  Apple announcement of June 4 at the Worldwide

15  Development Conference, correct?

16     A.   It is, yes.

17     Q.   Okay.  So as of June 6, 2018, the day of

18  this email, the Social Tech's planned Memoji app

19  was not capable of recording images, video, and

20  audio, correct?

21          MR. HECHT:  Objection.

22     A.   As of this date?

23     Q.   Yes.

24     A.   It was not capable of that, no.

25     Q.   And as of that June 6th date, the app

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 168

1          MR. HECHT:  Objection to form.

2      A.    He did work on the app, yes.

3      Q.    As far as you know, he didn't start work

4  on it before June 4, 2018, correct?

5      A.    I don't know that for a fact, but I know

6  that he did it afterwards for sure.

7      Q.    Well, you're the 30(b)(6) for Social

8  Tech on the Memoji app development.

9      A.    Right.

10      Q.    Do you have any -- isn't it true that

11  you're not aware of Mr. Idrees working --

12  Mr. Ashraf working on the Memoji app before

13  June 4, 2018?

14      A.    I'm not aware of anything, no.

15      Q.    Okay.  What was the financial

16  arrangement with Mr. Ashraf?

17      A.    I did not have one, that would be

18  Justin.

19      Q.    Okay.  Earlier we had looked at a Chase

20  QuickPay payment in Exhibit 85 that was -- you

21  directed to Mr. Grant.  Would Mr. Ashraf had

22  received a portion of that?

23      A.    I don't know.  You'd have to ask Justin

24  that.

25      Q.    Does Mr. Ashraf have a financial

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 171

1    numbered page 755 of the document.

2              And do you see a June 7, 2018, email

3    from you to Mr. Ashraf and Mr. Grant?

4         A.   Yes.

5         Q.   You write:  Good day, gentlemen.  Well,

6    it appears our collective moment has finally

7    arrived, exclamation point.  As I'm sure you guys

8    have discussed, this is life-changing.  You

9    gentlemen included.

10             The life-changing moment that you're

11   referring to was Apple's announcement of its

12   Memoji feature, right?

13             MR. HECHT:  Objection.

14        A.   Yes.

15        Q.   And you said it was life-changing

16   because Social Tech was preparing to assert a

17   claim against Apple and obtain a lot of money,

18   right?

19             MR. HECHT:  Objection to form.

20        A.   Potentially, yes.

21        Q.   And it was life changing for Mr. Grant

22   and Mr. Idrees because FlexDev would get a portion

23   of that money, as far as you knew, right?

24             MR. HECHT:  Objection.

25        A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 172

1        Q.    And then you continued in this email to

2   state:  Idrees, please let me know if you have any

3   questions or when it's time to add some graphics,

4   et cetera, so I can create another Dropbox folder

5   and send it all over to you.  Did I read that

6   correctly?

7        A.    Yes.

8        Q.    And then you wrote:  Time to get paid,

9   gentlemen.  Correct?

10       A.    Yes.

11       Q.    And this is another reference to getting

12  paid by Apple, right?

13       A.    Yes.

14             MR. HECHT:  Objection.

15       Q.    Then am I correct that, as the emails

16  goes on, the exchanges on pages 754 and 753

17  reflect communications regarding developing the

18  Social Tech MEMOJI app; is that right?

19       A.    This would have been in reference to

20  that, yes.

21       Q.    Okay.  And then turning, if you would,

22  to page 754, an email.  You sent an email on

23  June 12, 2018, to the group, correct?

24       A.    June 12, yes.

25       Q.    And in that email you state:  The app

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

1      A.    Yeah.

2      Q.    Didn't you write in this sentence, "of

3   course this may take a little work to get perfect,

4   but as long as we can get close initially, we can

5   start to test and put in commerce."  Do you see

6   that?

7      A.    Yes.

8      Q.    So weren't you saying that, as long as

9   you could get close to the trademark description,

10  you could launch something and put it in commerce

11  and then fix it later?

12          MR. HECHT:  Objection.

13     A.    I'm not sure exactly that.  Maybe I

14  meant more close to the image that I saw in my

15  head of what I wanted.

16     Q.    Well --

17     A.    I'm not a hundred percent sure.

18     Q.    Turning back, if you would, to

19  Exhibit 228, your sworn declaration in support of

20  Social Tech's motion for a preliminary injunction.

21          You can't find Exhibit 228?

22     A.    I'm looking for it.

23     Q.    Withdraw the question.

24          Let me ask the following:  Isn't it true

25  that it was Social Tech's intent to release a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 175

1    basic but functional version of its app in order

2    to secure its trademark registration?

3         A.    Yes.

4         Q.    Okay.  Now, turning, if you would...

5               Social Tech didn't have an Memoji app in

6    commerce prior to Apple's June 4, 2018,

7    announcement, right?

8               MR. HECHT:  Objection to form.

9         A.    We did not have an app in commerce, no.

10        Q.    And is it fair to say that your goal was

11   to release Social Tech's app to the public in

12   commerce as quickly as possible so Social Tech

13   could get a trademark registration for Memoji?

14              MR. HECHT:  Objection.

15        A.    We did want -- well, we had to rush our

16   product to finalize our registration to protect

17   our rights, yes.

18        Q.    Social Tech wanted to reserve Social

19   Tech's rights in the Memoji mark, right?

20              MR. HECHT:  Objection to form.

21        A.    Yes.

22        Q.    And you knew that, unless Social Tech

23   had its trademark registration, it couldn't sue

24   Apple, right?

25              MR. HECHT:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 176

1      A.    I knew that we couldn't protect
2   ourselves because we didn't have any common law.
3      Q.    So you knew you needed the registration
4   in order to file a claim against Apple, right?
5      A.    That was --
6           MR. HECHT:  Objection.
7      A.    The previous counsel mentioned that,
8   yes.
9           MR. HECHT:  Objection.  I'm going to
10          caution the witness do not reveal --
11          THE WITNESS:  Okay.
12          MS. CENDALI:  -- the substance of
13          attorney-client-privileged conversation and
14          information.
15     Q.    Now, turning to page 753 of Exhibit 75,
16   the email exchange that went back and forth we
17   were talking about.  Now, we're on a June 13th --
18   excuse me -- did you see a Wednesday, June 13th
19   email at 6:49 p.m. from you to the people in the
20   group?
21          It's towards the bottom of the page.
22     A.    June 13, 6:49?
23     Q.    Correct.
24     A.    Yes.
25     Q.    And am I correct that you wrote in that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 177

1    email:  In other news, the initial letter has been

2    sent to Apple.  The process has begun.

3              When you wrote "the initial letter has

4    been sent to Apple," do you mean the initial cease

5    and desist letter your counsel sent?

6         A.   Yes.

7         Q.   And then you closed your email with,

8    "Peace and wealth, exclamation point," right?

9         A.   Yes.

10        Q.   And that was also a reference to hoping

11   to get money from Apple, right?

12             MR. HECHT:  Objection.

13        A.   Well, we do speak in manifestation all

14   the time.

15        Q.   Yes.  And your reference to peace and

16   wealth, the wealth was a reference to getting

17   money from Apple, right?

18             MR. HECHT:  Objection.

19        A.   Sure.

20        Q.   Then turning to page 252 of the

21   document, the first page of Exhibit 75, there's a

22   June 17, 2018, email from you at 5:52 p.m.  Do you

23   see that?

24             And in that email you ask what

25   functionality is available at that point for the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 178

1    app; is that right?

2        A.   Yes.

3        Q.   And then you go on to say, quote, I know

4    that the background removal is difficult, but we

5    need to be able to apply some sort of filter

6    effect, et cetera, to satisfy the, quote, editing

7    requirement -- editing, unquote, requirement of

8    the trademark.  Do you see that?

9        A.   Yes.

10        Q.   And did you write that because you were

11    trying to make sure that the Social Tech app, when

12    released, would satisfy the language of the

13    trademark registration application?

14            MR. HECHT:  Objection.

15        A.   Yes.

16        Q.   Then turning to -- or further up the

17    page, a June 18, 2018, email from you, it states:

18    This is for Android, of course.  We are going to

19    push that one to the store first as I'm sure

20    Justin mentioned.  So please don't upload iOS

21    version yet.  Do you see that?

22        A.   Yes.

23        Q.   Why did Social Tech want to push -- when

24    you say "push," you mean release the Social Tech

25    MEMOJI app; is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

1    April 1, 2016, filing?

2         A.   Outside of looking at the USPTO, maybe

3    their website, basic things like that.  That's

4    about all I can recall.

5         Q.   You filed your initial Memoji -- excuse

6    me.

7              Social Tech filed its Memoji design mark

8    application on April 1st of 2016; is that correct?

9         A.   We filed April 1st of 2016, yes.

10        Q.   The investigation you did with regard to

11   availability, when was that done in relation to

12   that date?  In other words, did you do it in

13   the -- immediately before filing or some other

14   time?

15        A.   It would have been before filing.  I

16   don't know, I don't remember exactly when.

17        Q.   Is it the best of your recollection it

18   would be sometime relatively close to filing?

19             MR. HECHT:  Objection to form.

20        A.   I'm not sure.  I don't want to say.  I

21   don't want to speculate.

22        Q.   Then turning back to Exhibit 75 where

23   you wrote:  We are lining up all of our

24   information in preparation for a nice lawsuit

25   against Apple Inc.  We are looking really, all

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 183

1    caps, good.  Get your Lamborghini picked out.  Do

2    you see that.

3         A.   I do.

4         Q.   And when you wrote "get your Lamborghini

5    picked out," that was because you had high hopes

6    to receive life-changing money from Apple,

7    correct?

8              MR. HECHT:  Objection to form.

9         A.   We always do speak like that, but yeah.

10        Q.   And isn't it -- so this email thread

11   spans from June 7, 2018, to June 18, 2018, right?

12        A.   Right.

13        Q.   And these emails were private emails

14   between you and your colleagues, correct?

15             MR. HECHT:  Objection to form.

16        A.   Yeah.

17        Q.   In other words, the public couldn't --

18   didn't have access to these emails, right?

19        A.   Correct.

20        Q.   You weren't trying to posture to the

21   public in these emails, right?  You were just

22   talking to your colleagues, right?

23             MR. HECHT:  Objection to form.

24        A.   Correct.  Trying to pump them up.

25        Q.   Now, isn't it true that nowhere in this

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 184

```
1    chain did you complain that Apple's announcement
2    was harming Social Tech's business plans?
3              MR. HECHT:  Objection to form.
4         A.   I don't think so.
5         Q.   In fact, nowhere in this chain of emails
6    did anyone express unhappiness that Apple had
7    announced a feature called Memoji, right?
8              MR. HECHT:  Objection.
9         A.   It does not look like it, no.
10        Q.   I mean, to the contrary, the emails
11   reflect your excitement about the possibility to
12   get life-changing money from Apple to buy a bunch
13   of Lamborghinis, correct?
14             MR. HECHT:  Objection to form.
15        A.   A Lamborghini would have been a nice
16   side effect, that was not the goal, no.
17        Q.   Well, your emails reflected excitement
18   about the possibility of getting a lot of money;
19   is that fair to say?
20             MR. HECHT:  Objection.
21        A.   Sure.
22        Q.   So when you said "our collective moment
23   finally arrived," you weren't expressing
24   unhappiness, were you?
25             MR. HECHT:  Objection.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 185

1      A.    That was not collective unhappiness, no.

2      Q.    And when you said this is life changing,

3  you weren't expressing unhappiness, right?

4           MR. HECHT:  Objection.

5      A.    It was not unhappy, no.

6      Q.    And when you wished your friends peace

7  and wealth, you weren't expressing unhappiness,

8  right?

9      A.    No.

10      Q.    And when you said, "Get your Lamborghini

11  picked out," you weren't expressing unhappiness,

12  right?

13           MR. HECHT:  Objection.

14      A.    No.

15      Q.    You were happy that Apple's announcement

16  might lead to Social Tech getting a lot of money

17  if it could obtain its trademark registration,

18  right?

19           MR. HECHT:  Objection.

20      A.    Potentially, yes.

21           (Email Exchange, Bates SocialTech_0000777

22      to SocialTech_0000784, marked as Bonet Exhibit

23      238, as of this date.)

24  BY MS. CENDALI:

25      Q.    All right.  Let's take a look at Exhibit

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 201

1      Q.    Sure.  Did you get these bills from

2   FlexDev for its work with regard to the Social

3   Tech MEMOJI app?

4      A.    I did receive them, yes.

5      Q.    Were they paid?

6      A.    No.

7      Q.    Why not?

8      A.    It was my understanding this was him

9   keeping track, more like an accounting basis for

10   him, I believe.

11      Q.    Because the idea was that FlexDev was to

12   be compensated pursuant to the 5 percent

13   contingency deal, right?

14          MR. HECHT:  Objection to form.

15      A.    That was the idea, yes.

16      Q.    Okay.  Has FlexDev been paid anything to

17   date for its work on the Social Tech MEMOJI app?

18      A.    Yes.

19      Q.    Was that only the monies talked about

20   earlier in connection with payments that had to go

21   to some of their contractors who needed to be paid

22   up front?

23          MR. HECHT:  Objection to form.

24      A.    To the best of my knowledge, yes.

25      Q.    So am I correct that Social

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

1    Technologies' Memoji app was released on June 28,

2    2018?

3         A.    I believe it was released June 28, yes.

4         Q.    And this was approximately only three

5    weeks after FlexDev started working on it, right?

6              MR. HECHT:  Objection to form.

7         A.    Roughly, yes.

8         Q.    And I take was it your decision to

9    launch the app on June 28, 2018?

10        A.    Yes.

11        Q.    And the app was only launched on Google

12   Play, correct?

13        A.    Correct.

14        Q.    And let me show you what's been marked

15   as Exhibit 79.

16              Is this an email exchange between and

17   among you, Mr. Ashraf, and Justin Grant ranging

18   from June 26th to June 28th of 2018?

19        A.    This is an email between us, yes.

20        Q.    And in Mr. Idrees' June 28 -- excuse

21   me -- Mr. Ashraf's June 28, 2018, email of

22   3:41 a.m., he asks for certain things including in

23   number 2, app description in line 1; and 3, app

24   description as a detailed paragraph.  Do you see

25   that?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.    But there are documents about the Social

2   Tech app crashing; isn't that true?

3            MR. HECHT:   Objection.

4      A.    Correct.

5      Q.    Isn't it true that users in addition to

6   yourself complained that the Social Tech app was

7   crashing?

8            MR. HECHT:   Objection.

9      A.    I would have to see the complaints that

10   you're talking about to refresh my memory.   I'm

11   not positive offhand.

12     Q.    Isn't it true that, in submitting your

13   declaration in support of Social Tech's motion for

14   preliminary injunction, you included comments from

15   users who complained about the app crashing?

16           MR. HECHT:   Objection.

17     A.    I'm certain I had seen the document?

18     Q.    You're the 30(b)(6), do you have any

19   knowledge as to whether the Social Tech app was

20   crashing after it was released?

21           MR. HECHT:   Objection.

22     A.    It did crash after its initial release,

23   yes.

24     Q.    Right.   And isn't it true that it also

25   sometimes would present the images upside down?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 207

1           MR. HECHT:  Objection to form.

2      A.    Initially it did, yes.

3      Q.    Was the Social Tech MEMOJI app beta

4  tested before it was released on June 28?

5           MR. HECHT:  Objection.

6      A.    By the engineers, I believe.

7      Q.    Was it beta tested the way you beta

8  tested the Hellojis app?

9           MR. HECHT:  Objection to form.

10     A.    I don't believe that there's a

11 TestFlight equivalent on Android, so it would have

12 been a little bit different, I believe.

13     Q.    You're not aware of any TestFlight

14 equivalent beta testing done on the Social Tech

15 app, correct?

16          MR. HECHT:  Objection.

17     A.    I don't -- I'm sure I may have had an

18 initial version.  I mean, I think so.

19     Q.    You think so what?

20     A.    That I had a version, yes.

21     Q.    Isn't it true that Social Tech released

22 its Memoji app without any beta testing?

23          MR. HECHT:  Objection.

24     A.    I'm not positive on that, no.

25     Q.    I remind you that you're the 30(b)(6)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 211

1      Q.   Well, Social Tech filed its statement of

2   use with the PTO for its Memoji design app on

3   June 30th of 2018; is that right?

4      A.   We filed our statement of use, I believe

5   so, yes.

6      Q.   And that was after Social Tech sent a

7   cease and desist letter to Apple on June 13, 2018,

8   correct?

9      A.   What was the date of the cease and

10  desist?

11     Q.   June 13, 2018.

12     A.   I believe that's correct, yes.

13     Q.   And am I correct that the very next day

14  after Social Tech sent Apple its cease and desist

15  letter, Apple responded to Social Tech's cease and

16  desist letter on June 14?

17     A.   I believe so, yes.

18     Q.   And do you recall that in that letter

19  Apple responded by explaining that it had acquired

20  the rights to Lucky Bunny's Memoji mark?

21          MR. HECHT:  Objection to form.

22     A.   They did respond that way, yes.

23     Q.   And I take it that you reviewed the

24  cease and desist letter your then counsel sent

25  before it was -- wrote before it was sent?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 212

1           MR. HECHT:  And I'll just caution the

2      witness not to reveal any

3      attorney-client --

4      Q.    That's just a yes or no.

5           MR. HECHT:  My standing warning.

6      A.    Did I review it?

7      Q.    Yes.

8      A.    Yes.

9      Q.    And I take it you reviewed Apple's

10   response to that letter shortly after it was sent

11   as well, correct?

12      A.    Correct.

13      Q.    And two weeks later on June 30th, Social

14   Tech filed its statement of use, correct?

15      A.    We did file our statement of use

16   June 30th, yes.

17           I'll point out there was another

18   correspondence in between that.

19           MS. CENDALI:  I need to find a

20      document.  Can we go off the record?

21           MR. HECHT:  Sure.

22           THE VIDEOGRAPHER:  The time on the --

23      the time on the video monitor is 3:58 p.m.

24      We're off the record.

25           (Whereupon, off the record.)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 213

1           (Whereupon, resumed.)

2           THE VIDEOGRAPHER:  We are back on the

3       record.  The time on the video monitor is

4       4:12 p.m.

5   BY MS. CENDALI:

6       Q.   Mr. Bonet, please turn back to

7   exhibit -- what has been previously marked and

8   shown to you in your deposition as Exhibit 227,

9   which is the collection of documents reflecting

10  the file regarding Social Tech's trademark

11  application history for its Memoji design mark.

12  And turn, if you would, to page, Bates numbered

13  page 228 of that document.

14      A.   (Complies.)

15      Q.   That is the statement of use that Social

16  Tech filed on June 30 of 2018, correct?

17      A.   Yes.

18      Q.   And you filed that on behalf of Social

19  Tech, correct?

20      A.   Yes.

21      Q.   And it reflects a first-use date of

22  June 28th of 2018, the date of the launch; is that

23  correct?

24      A.   Yes.

25      Q.   And you signed the application along

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 214

1    with Mr. Long on behalf of Social Tech; is that

2    right?

3         A.    Yes.

4         Q.    And then turning, if you would, to the

5    Bates numbered page 231, there's the declaration

6    that you had to commit to in submitting the

7    application -- the certificate of use, correct?

8              At the top of page 231 is a declaration

9    that states:  To the best of the signatory's

10   knowledge and belief, no other persons, except, if

11   applicable, authorized users, members and/or

12   concurrent users, have the right to use the mark

13   in commerce, either in the identical form or in

14   such near resemblance to be likely, when used on

15   or in connection with the

16   goods/services/collective membership organization

17   of such other purposes or such other persons, to

18   cause confusion or mistake or to deceive.  Do you

19   see that?

20        A.    I do.

21        Q.    And when you signed -- and when you

22   submitted Social Tech's statement of use on

23   June 30, 2018, you had heard that that was true,

24   correct?

25             MR. HECHT:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 215

1    A.    Correct.

2    Q.    And you submitted a declaration to the

3  effect that no one else had the right to use the

4  mark in commerce even though you were aware that

5  the Lucky Bunny app was still available, correct?

6         MR. HECHT:  Objection.

7    A.    Yes.

8    Q.    And, in fact, just a few weeks before,

9  you had re-downloaded the Lucky Bunny app and

10  opened it, right?

11         MR. HECHT:  Objection.

12    A.    Yes.

13    Q.    And you knew that Lucky Bunny had filed

14  two separate trademark applications for its mobile

15  app, both of which were use based, correct?

16         MR. HECHT:  Objection.

17    A.    Yes.

18    Q.    And you knew that Lucky Bunny came up

19  when you did Google searches in 2016, correct?

20    A.    Correct.

21    Q.    And you knew by then that Lucky Bunny

22  had been promoted by celebrity Howie Mandel,

23  correct?

24    A.    I don't recall saying that at that time,

25  no.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 216

1    Q.   As of the time that you filed your

2    statement of use on June 30th of 2018, you knew --

3    A.   At that time.

4    Q.   -- you knew that Lucky Bunny had been

5    promoted by celebrity Howie Mandel, correct?

6    A.   Yes.

7    Q.   But you still swore under the oath to

8    the PTO that no other users had the right to use

9    the Memoji mark, correct?

10   MR. HECHT:   Objection.

11   A.   Correct.

12   Q.   The page 231 goes on to say:  To the

13   best of the signatory's knowledge, information and

14   belief, formed after inquiry reasonable under the

15   circumstances, the allegations and other factual

16   contentions made above have evidentiary support.

17   You understood that you were swearing to

18   that, right?

19   MR. HECHT:   Objection to form.

20   A.   Yes.

21   Q.   And what additional investigation did

22   you do regarding Lucky Bunny after your initial

23   investigation that preceded Social Tech's April 1,

24   2018, trademark application and Social Tech's

25   June 30th, 2018, filing of its statement of use?

Page 218

1      A.    It could send audio, yes.

2      Q.    Did Social Tech's MEMOJI app work on

3   computers when it was launched?

4      A.    Did it work on computers?

5            MR. HECHT:  Objection to form.

6      A.    It wasn't built for computers, it was

7   built as a mobile application.

8      Q.    Well, following the launch of Social

9   Tech's MEMOJI app, FlexDev, at Social Tech's

10   request, updated the app, correct?

11      A.    Correct.

12      Q.    And isn't it true that Social Tech

13   wanted to have many updates in order to make it

14   appear in this litigation that it was actively

15   updating the app?

16            MR. HECHT:  Objection to form.

17      A.    I believe an app should be updated

18   regardless.

19      Q.    But isn't it true that Social Tech

20   specifically wanted to split work that could have

21   been done in a single update into multiple updates

22   in order to show that it had more updates?

23            MR. HECHT:  Objection.

24      A.    I'm not sure.  Do you have a document

25   that speaks to that?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 221

```
 1   and Mr. Grant that their work was to assist Social
 2   Tech with regard to getting paid by Apple, right?
 3              MR. HECHT:  Objection to form.
 4        A.    Can you rephrase the question, please.
 5        Q.    Sure.  You had discussions and emails
 6   with Mr. Ashraf and Mr. Grant about how FlexDev
 7   was assisting Social Tech in pursuing a claim for
 8   a lot of money against Apple, right?
 9              MR. HECHT:  Objection to form.
10        A.    I'm not a hundred percent sure what
11   you're trying to say.  Please clarify.
12        Q.    You were emailing these guys about,
13   "Hey, guys, gentlemen, it's time to get paid and
14   we can all get Lamborghinis," right?
15              MR. HECHT:  Objection to form.
16        A.    I did say that.
17        Q.    Yeah.  And then later in this email of
18   July 14, 2018, it says:  How are we looking on
19   everything?  What else do you need from me for --
20   and you list home screen, app, cutouts,
21   translations, big fishes, fixes, crash fixes (app
22   is crashing a lot it seems).  Do you see that?
23        A.    I do.
24        Q.    Yeah.  And so on July 14th that was
25   after the Social Tech app had been released,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

1  correct?

2      A.   Yes.

3      Q.   And you yourself wrote that the Social

4  Tech app was crashing a lot and you were being

5  truthful, correct?

6          MR. HECHT:  Objection.

7      A.   Correct, because I was testing it on an

8  old phone.

9      Q.   Well, you didn't specify in this email

10 that it was you were testing it on an old phone,

11 you didn't limit it to that phone in this email,

12 right?

13         MR. HECHT:  Objection.

14     A.   Not in this email, but a previous one we

15 went over, I believe.

16     Q.   Right.  But we also discussed the people

17 who use different phone were complaining that the

18 app was crashing; isn't that true?

19         MR. HECHT:  Objection to form.

20     A.   I believe I asked for clarity on that.

21 I don't remember that.

22     Q.   Let's keep going.  I think the testimony

23 is clear.

24         You go on to say, "Of course --" and you

25 were -- "it seems best to split these up to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 225

1     Q.   And when was that done?

2     A.   After we took assignment.  I'm not sure

3  of the exact date.  It would have been May

4  sometime, I believe.

5     Q.   Okay.  So you're familiar with

6  Christopher Anthony, right?

7     A.   Yes.

8     Q.   And you learned that -- you learned --

9  after Apple's June 4, 2018, announcement of its

10  Memoji feature that Mr. Anthony had an

11  MEmoji-Emoji Yourself app; is that right?

12     A.   I'm sorry.  It was -- say that again,

13  please.

14     Q.   Sure.  You learned after June 4th of

15  2018 that Mr. Anthony had a MEmoji-Emoji Yourself

16  app at some point, correct?

17     A.   I was made aware of his Facebook page

18  and that an app existed and that it was not

19  active.

20     Q.   Okay.

21     A.   Anywhere.

22     Q.   And when you say it wasn't active

23  anywhere, what information did you have about

24  that?

25     A.   It was not on the App Store.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

1        Q.    And did you do anything to investigate

2    Mr. Anthony's app?

3              MR. HECHT:   Objection to form.

4        A.    I looked at his Facebook page and I

5    searched the App Store for his app as well.

6        Q.    And what did you learn?

7        A.    It was not there.

8        Q.    And when did you do the searching?

9        A.    I don't recall exactly when.

10       Q.    It was after June 4th of 2018, though,

11   correct?

12       A.    It would have been after June 4th, yes.

13       Q.    So let's go back and take a look at

14   Exhibit 232, which should have been made more

15   accessible for you, which is your Declaration in

16   Support of Plaintiff's Opposition to Christopher

17   Anthony's Motion to Intervene.

18       A.    232.

19       Q.    Did you find it?

20       A.    232, yes.

21       Q.    And we talked about this document

22   earlier that day, correct?

23       A.    Yes.

24       Q.    In Paragraph 2 you wrote:  A review of

25   that Facebook page showed no activity related to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 232

1    Mr. Anthony's app had very few downloads?

2         A.    He would have mentioned that, yes.

3         Q.    And you understood that to be true?

4              MR. HECHT:   Objection to form.

5         A.    Yes.

6         Q.    Did you have any discussions with

7    Mr. Anthony yourself about the number of downloads

8    his app had had?

9         A.    I believe we touched on it on a phone

10   call.

11        Q.    When was that?

12        A.    Early December, I believe.

13        Q.    And what did he tell you?

14        A.    I don't recall exactly.

15        Q.    Did he tell you that he had very few

16   downloads?

17        A.    I'm sure he probably mentioned he did

18   not have a lot.

19        Q.    Did he mention to you that his app had

20   been down for a number of years?

21        A.    Yes.

22        Q.    And what did he -- what's the best you

23   can recall that he said on that subject?

24              MR. HECHT:   Objection to form.

25        A.    That he -- his app was down.  I believe

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233

1    it was because he -- something about not paying

2    the developer fee, something to that effect.

3         Q.   And did he have anything else to say to

4    you with regard to why and for how long his app

5    was down?

6         A.   I don't recall exactly.

7         Q.   And when did this conversation about his

8    app being down take place?  Was that in December

9    of 2018 or some other time?

10        A.   That would have been the December of

11   2018.

12        Q.   Since that time, do you have any

13   additional information about Mr. Anthony's app

14   being down?

15        A.   The information that was presented in

16   his motion to intervene would have been the only

17   new information.

18        Q.   Okay.  Well, going back to Exhibit 232,

19   your declaration in opposition to his motion to

20   intervene that we've been talking about, Paragraph

21   3, it says:  Based on the additional information

22   Grant and Anthony provided to me regarding the

23   small number of Anthony app downloads.

24             And, again, have you told me everything

25   that Grant and Anthony provided to you regarding

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1    the small number of Anthony app downloads or do

2    you have more information other than what you have

3    already provided?

4          A.    This is sales.  I believe we produced a

5    document that had downloads on it as well.

6          Q.    Okay.

7          A.    That would have been additional

8    information.

9          Q.    But you got information about the number

10   of Anthony downloads prior to when you submitted

11   this declaration on March 25, 2019, in opposition

12   of his motion to intervene, correct?

13               MR. HECHT:  Objection to form.

14         A.    That's a little vague.  I'm not quite

15   following you.

16         Q.    Sure.  Let's simplify.  You signed this

17   declaration under oath on March 25 of 2019,

18   correct?

19         A.    Yes.

20         Q.    And this was in opposition to

21   Mr. Anthony's motion to intervene in this case,

22   correct?

23         A.    Correct.

24         Q.    And in Paragraph 3 of that declaration,

25   you wrote:  Based on the additional information

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

1    Grant and Anthony provided to me regarding the

2    small number of Anthony app downloads.

3                Can you tell me as best you can is what

4    you were referring to when you wrote that, what

5    your basis was?

6                MR. HECHT:  Objection to form.

7         A.    To the best of my knowledge, that would

8    have been from the first time that Justin spoke

9    with Anthony up until I ceased communications.

10   All that information did not come at the same

11   time.

12        Q.    Okay.  And the information that you had,

13   was it that Mr. Anthony's app had less than a

14   thousand downloads; is that right?

15        A.    Do you have a document that speaks to

16   that?  I don't recall the number.

17        Q.    You're the 30(b)(6) witness.  I'm asking

18   you whether you prepared to testify about the

19   Anthony app.

20        A.    Yes.

21        Q.    Okay.  Do you recall how many downloads

22   it ever had?

23        A.    Not exactly, no.

24        Q.    Can you approximate?

25                MR. HECHT:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

1      A.    I'd be speculating.  I'm not sure.

2      Q.    What's your best recollection of how

3  many downloads the Anthony app had?

4            MR. HECHT:  Objection.  Outside the

5      scope.

6      A.    I would have to speculate.  I'm not

7  sure.

8      Q.    You said -- you also wrote "and the lack

9  of updates to the Anthony app."  What did you mean

10  by that?

11      A.    That his app was not updated.

12      Q.    And did you consider that a factor in

13  deciding that Mr. Anthony held no rights of value

14  to Social Tech?

15            MR. HECHT:  Objection to form.

16      Outside the scope.

17      A.    All of these things combined led me to

18  that conclusion at that time.

19      Q.    And did you understand that, that when

20  you executed this declaration on March 25, 2019,

21  that Mr. Anthony had not updated his app?

22            MR. HECHT:  Objection to form.

23      Outside the scope.

24      A.    Was I aware that he had not updated his

25  app?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 237

1        Q.   Yes.  You wrote:  Based on the

2   additional information Grant and Anthony provided

3   to me regarding the small number of Anthony apps

4   and the lack of updates to the Anthony app.  When

5   you wrote and signed under oath "the lack of

6   updates to the Anthony app," what were you

7   meaning?

8        A.   That he didn't update his app.

9        Q.   And in your mind that was a factor in

10  deciding that you -- that he did not hold rights

11  of value to Social Tech, correct?

12            MR. HECHT:  Objection to form.

13       Outside the scope.

14       A.   At that time, yes.

15       Q.   Yeah.  And then you went on to say:  I

16  decided that Anthony held no rights of value to

17  Social Tech and did not make efforts to purchase

18  anything from Anthony.  Do you see that?

19       A.   Yes.

20       Q.   Since you signed this declaration on

21  March 25, 2019, did you receive any additional

22  information with regard to Mr. Anthony and his

23  app?

24       A.   I don't believe so.

25       Q.   Were you being truthful when you wrote

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246

1  is only legally relevant if the mark was used

2  continuously?

3          MR. HECHT:  Objection to form.

4      A.   I'm not a trademark attorney to answer

5  that.

6      Q.   Have you ever -- have you heard of that?

7      A.   Have I heard of?

8      Q.   Have you ever heard of the idea that in

9  order to have trademark rights you need to use the

10 mark continuously?

11         MR. HECHT:  Objection to form.

12     A.   I believe I have heard that, yes.

13     Q.   And isn't it true that Mr. Anthony's app

14 was down for more than three years?

15         MR. HECHT:  Objection to form.

16     A.   I know that it was down for a while, I

17 don't know exactly how long.

18     Q.   Isn't it true that Mr. Anthony's app was

19 only put back up in the fall of 2019 after Social

20 Tech contacted him about claims against Apple?

21         MR. HECHT:  Objection.

22     A.   I believe his app went back up after

23 Justin spoke to him, initially.

24     Q.   Right.  So isn't it true that

25 Mr. Anthony's app only went back up after Justin

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 249

1    signed your May 25, 2019, declaration in

2    opposition to his motion to intervene?

3         A.    No.

4         Q.    All right.  Let's go back and look at

5    what's been previously marked as Exhibit 228, your

6    declaration in support of Social Tech's motion for

7    preliminary injunction.

8              228.

9              All right.  Turning to Paragraph 14 of

10   your declaration, you stated:  Indeed, a number of

11   customers and potential customers have already

12   expressed confusion and negative comments on our

13   Memoji Facebook page and on our Apple Play site.

14   Do you see that?

15        A.    Yes.

16        Q.    Okay.  Did you, in your declaration --

17   am I correct that all instances of what Social

18   Tech claims constitutes actual confusion are

19   reflected in your declaration of September 27,

20   2018?

21             MR. HECHT:  Objection to form.  Also

22        outside the scope.  Calls for expert

23        testimony.

24        A.    I believe this is all of them, yes.

25        Q.    So you're not aware -- Social Tech is

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250

1    not aware of any additional instances of what it

2    claims is actual confusion since you submitted

3    this declaration to the Court on September 27,

4    2018, correct?

5          MR. HECHT:  The same objections.

6          A.   To the best of my knowledge, this is all

7    there is.

8          Q.   Fair enough.  And then turning -- if

9    looking at your declaration, we're at Paragraph 15

10   where you're quoting a, a user as saying:  What

11   kind of app is this?  This app looks nothing like

12   the app on the iPhone.

13         There's nothing about the statements

14   made by that person that indicates that the person

15   thought that Social Tech's app came from Apple or

16   was affiliated with Apple, correct?

17         MR. HECHT:  Objection to form.

18         A.   It appears that they expected to.

19         Q.   Are you done with your answer?

20         A.   Yes.

21         Q.   Do you know Kione Marissa Key who posted

22   this?

23         A.   No.

24         Q.   Then in Paragraph 17 of your declaration

25   there were -- you wrote there were two messages on

Page 255

```
 1        A.    Yes.
 2        Q.    So now isn't it true that the Social
 3   Tech MEMOJI app was taken down by Google for a
 4   period of time?
 5        A.    Yes.
 6        Q.    And did you have communications with
 7   Google about this?
 8        A.    A few emails, yes.
 9             ("Your Appeal for Restatement" Email,
10        Bates GOOG-MEMO_00000007 to
11        GOOG-MEMO_00000008, marked as Bonet Exhibit
12        248, as of this date.)
13             ("Your Appeal for Restatement" Email,
14        Bates SocialTech_0000820 to
15        SocialTech_0000825, marked as Bonet Exhibit
16        248, as of this date.)
17   BY MS. CENDALI:
18        Q.    Well, let's take a look at what's been
19   marked as Exhibits 247 and 248.
20             Are these emails -- 247 has the Bates
21   number GOOGLE_7, which means it was produced by
22   Google.  And 248 starts with the Bates number
23   SocialTech_820.
24             Are these collections of email exchanges
25   with Google about Google's taking down the Social
```

Page 262

1    Social Tech and Google.

2    BY MS. CENDALI:

3        Q.   Sitting here today, what is your best

4    understanding as to why Google took down Social

5    Tech's MEMOJI app?

6        A.   I have no idea.  That's what I was

7    trying to find out with this.

8        Q.   You are the 30(b)(6) witness on this

9    topic, you have no idea whatsoever as to why it

10   was taken down?

11       A.   They mention violations of a developer

12   program policy, which is kind of vague.  I don't

13   know what those were.  I asked for clarification

14   and I received none.

15       Q.   Isn't it -- how was it that Social Tech

16   got its app back up again?

17       A.   I had to open another developer account

18   and re-upload the app.

19       Q.   Did you open a new developer account

20   under the name Samuel Ernesto?

21       A.   Yes.

22       Q.   Is Ernesto your middle name?

23       A.   Yes.

24       Q.   Do you see on Exhibit 248, page 821, in

25   the email that we were talking about where Google

Page 263

1    Play wrote:  Your Google Play developer account

2    has been terminated due to multiple violations of

3    the developer program policies.

4           Do you see in the second paragraph of

5    that email they wrote:  Do not attempt to register

6    a new developer account.  Any new accounts will be

7    closed and your developer registration fee will

8    not be refunded.  We recommend that you use an

9    alternative method for distributing your apps in

10   the future.

11          You read that at the time you got this,

12   right?

13       A.   Yes.

14       Q.   But despite Google specifically telling

15   you not to register a new development account,

16   that's exactly what you did, right?

17          MR. HECHT:  Objection to form.

18       A.   Yes.

19       Q.   And so is it fair to say that Social

20   Tech will not follow the rules when it suits its

21   interest?

22          MR. HECHT:  Objection to form.

23       A.   Absolutely not.  I asked for

24   clarification and more information.  I did not

25   receive any.  I made a judgment call because I

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1    know I had more than 5,000 at one point, but I

2    cannot access the account any longer, so I

3    couldn't see.

4        Q.    Did you encourage your friends and

5    family to download the app?

6            MR. HECHT:  Objection.

7        A.    To some degree, I told people that I

8    knew to download it, sure.

9        Q.    What percentage of Social Tech's

10   downloads were for people in the United States?

11           MR. HECHT:  Objection.

12       A.    I don't know.

13       Q.    Let's go back to your declaration that

14   you submitted in support of your motion for a

15   preliminary injunction.  It should be sitting in

16   front of you, Exhibit 228.  And if you would

17   please turn to Paragraph 8.

18           In Paragraph 8 you wrote:  I created a

19   thorough presentation and began seeking investors

20   for Memoji in April 2016.

21           And then you wrote:  And began promoting

22   Memoji on the Social Tech website as of January 4,

23   2017, and with two promotional videos posted to

24   YouTube also on January 4, 2017.  Do you see that?

25       A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 272

1       Q.    Were you one of the people who viewed

2   the videos?

3       A.    Probably.

4       Q.    Were any of your friends and family?

5             MR. HECHT:  Objection.

6       A.    I'm sure a few, yes.

7       Q.    Okay.  So let's then take a look at

8   Paragraph 13 of your declaration, where it says:

9   I've also been active in promoting our Memoji app

10  by purchasing Facebook advertisements and posting

11  on Facebook, et cetera.  Do you see that in the

12  first paragraph?

13      A.    Yes.

14      Q.    The first sentence of Paragraph 13.

15            Other than -- is all the -- let me ask

16  this:  Are the activities mentioned in Paragraph

17  13 of your declaration of September 27, 2018, in

18  support of Social Tech's motion for a preliminary

19  injunction all things that Social Tech did after

20  Apple's announcement of June 4th of 2018?

21      A.    Yes.

22      Q.    When you wrote, "We also engaged a

23  company to enhance search engine optimization

24  (SEO)," that was FlexDev, right?

25      A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 273

1      Q.   And going back to Paragraph 11 of your

2   declaration, you wrote:  Before Apple announced

3   its Memoji feature, a search for Memoji would have

4   turned up our Memoji at or near the top of search

5   results.  Do you see that?

6      A.   Yes.

7      Q.   But isn't it true that when you

8   yourself, as you previously testified, searched

9   for Memoji, you found Lucky Bunny, correct?

10          MR. HECHT:  Objection.

11     A.   That would have been before I posted

12   those videos, so that would not -- they would not

13   have come up.

14     Q.   Well, do you have any documents

15   reflecting any searches that had been done to

16   corroborate your statement that before Apple

17   announced its Memoji feature, a search for Memoji

18   would have turned up Social Tech's Memoji at or

19   near the top of search results?

20     A.   No.

21     Q.   As far as you know, was Social Tech's

22   MEMOJI app ever promoted by any celebrities?

23     A.   No.

24     Q.   As far as you know was Social Tech's

25   MEMOJI app ever mentioned on any talk shows?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274

1    A.   No.

2    Q.   As far as you know, was Social Tech's

3  MEMOJI app ever mentioned in any national

4  publications?

5    A.   No.

6    Q.   Was it ever mentioned in any

7  publications?

8         MR. HECHT:  Objection.

9    A.   Yes.

10   Q.   Other than in regard to this lawsuit.

11   A.   No.

12   Q.   How much money has Social spent prior to

13 Apple's announcement of January -- of June 4,

14 2018, in marketing or promoting its Memoji app?

15   A.   I don't know the exact number offhand.

16 I believe I've produced documents with that

17 information.

18   Q.   Was it less than $5,000?

19        MR. HECHT:  Objection.

20   A.   I'm not exactly sure.  I don't want to

21 speculate.

22   Q.   Okay.  I remind you you're the 30(b)(6)

23 and you should have been prepared to at least

24 approximate on this topic.

25        How much money has Social spent to date

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 276

1    business called XPNSV?  X-P-N-S-V.

2         A.    That would be underneath Social Tech,

3    yes.

4         Q.    And XPNSV has nothing to do with Social

5    Tech's MEMOJI app, correct?

6         A.    Correct.

7         Q.    Isn't it true that the reason there are

8    no documents reflecting any development by Social

9    Tech of the Memoji app in 2017 and 2018 prior to

10   Apple's announcement is because Social Tech wasn't

11   working on it?

12              MR. HECHT:  Objection.

13        A.    We were building Hellojis and had

14   several other things going on at the same time to

15   generate money, yes.

16        Q.    Isn't it true that Social Tech had

17   switched its focus to its adult film business?

18        A.    We don't have an adult film business.

19              (YouTube Video Screenshot titled

20         Charlie Grace in "Battery Operated

21         Boyfriend" marked as Bonet Exhibit 267, as

22         of this date.)

23   BY MS. CENDALI:

24        Q.    Let's show you what's been marked as

25   Exhibit 267.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 292

```
5    any of the companies that you've been associated

6    with?

7         A.    Not to my knowledge, no.

8         Q.    Other than this lawsuit against Apple,

9    have you or any of the companies you've been

10   involved with sued anyone?

11        A.    No.

12        Q.    Just to be clear, did Social Tech use

13   the Memoji mark to sell anything prior to June 28,

14   2018?

15             MR. HECHT:  Objection.

16        A.    Use the mark to sell anything?

17        Q.    Correct.

18        A.    No.

19        Q.    Social Technologies did not sell any

20   goods under the Memoji mark prior to the launch of

21   its app on June 28, 2018; is that correct?

22             MR. HECHT:  Objection.

23        A.    Did we sell any goods under Memoji, no.

24        Q.    Social Technologies did not sell any

25   services under the Memoji mark prior to the launch
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 293

1    of its app on June 28, 2018, correct?

2            MR. HECHT:  Objection.

3        A.   No.

4            MS. CENDALI:  Thank you.  Let's take a

5        break.  We probably only have a few minutes

6        left, but let's see where we are.

7            THE VIDEOGRAPHER:  The time on the

8        video monitor is 6:43 p.m.  We're off the

9        record.

10            (Whereupon, off the record.)

11            (Whereupon, resumed.)

12            THE VIDEOGRAPHER:  We are back on the

13        record.  The time on the video monitor is

14        7:00 p.m.

15   BY MS. CENDALI:

16        Q.   Mr. Bonet, we discussed a conversation

17   that you had with Chris Anthony on December 13,

18   2018, regarding buying his rights.  Remember he

19   had that in his declaration?

20        A.   Yes.

21        Q.   Okay.  How many times have you spoken to

22   Mr. Anthony?

23        A.   Total?

24        Q.   Yeah.

25        A.   A handful.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 303

1    BY MS. CENDALI:

2        Q.    Let me show you what's been marked as

3    Exhibit 258.  Can you identify Exhibit 258?

4        A.    This is another YouTube account that we

5    have.

6        Q.    And is this the account where you posted

7    the two Memoji videos you discussed in your

8    declaration in support of the motion for a

9    preliminary injunction?

10       A.    There is where they were housed, yes.

11       Q.    All right.  And was one of the

12   commercials -- or excuse me, is one of the videos

13   that you referenced in your declaration the Memoji

14   shopping commercial?

15       A.    Yes.

16       Q.    And did it have 457 views as of July 1,

17   2019?

18       A.    According to this, yes.

19       Q.    And you have no reason to think that's

20   not right, correct?

21       A.    No.

22       Q.    And then it also listed the Memoji park

23   commercial, that's the other commercial or video

24   referenced in your declaration, correct?

25       A.    Correct.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 304

1    Q.   And that indicated that it had 70 views

2    as of July 1, 2019, correct?

3    A.   Correct.

4    Q.   Let me show you what's been marked --

5    and who are the two women depicted in those image

6    commercials?

7    A.   One --

8        MR. HECHT:  Objection.

9        THE WITNESS:  Sorry.

10   A.   One was Nicole Martin, who was my

11   girlfriend at the time, which we've referenced.

12   And the other one was Charlie Grace, the singer

13   from the video.

14       (YouTube Screenshot titled MeMOJI "Park"

15       Commercial marked as Bonet Exhibit 254, as of

16       this date.)

17       (YouTube Screenshot titled MeMOJI

18       "Shopping" Commercial marked as Bonet Exhibit

19       255, as of this date.)

20   BY MS. CENDALI:

21   Q.   Can you identify Exhibit 2 -- can you

22   tell me the name of what I just gave you, what

23   exhibit number is on it?

24   A.   254.

25   Q.   What is Exhibit 254?