# EXHIBIT 8

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Vince Chhabria, Magistrate Judge

4

5  SOCIAL TECHNOLOGIES, LLC.,     )
                                  )
6           Plaintiff,            )
                                  )
7  vs.                           )     No. C 18-05945-VC
                                  )
8  APPLE, INC.,                  )
                                  )
9           Defendant.           )
   _____)

10

11                              San Francisco, California
                                Thursday, December 12, 2019
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING  10:11 - 10:40 = 29 MINUTES
14

15 APPEARANCES:

16 For Plaintiff:
                                Pierce, Bainbridge, Beck
17                                 Price & Hecht, LLP
                                277 Park Avenue, 45th Floor
18                              New York, New York 10172
                           BY:  DAVID L. HECHT, ESQ.
19                              MELODY L. MCGOWIN, ESQ.

20                              Pierce, Bainbridge, Beck
                                   Price & Hecht, LLP
21                              355 South Grand Avenue
                                44th Floor
22                              Los Angeles, California 90071
                           BY:  KATHRYN L. BOYD, ESQ.
23

24           (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

1  APPEARANCES:   (Cont'd.)

2  For Defendant:

                                Kirkland & Ellis, LLP
3                               333 South Hope Street
                                Los Angeles, California 90071
4                      BY:   DIANA M. TORRES, ESQ.

5                               Kirkland & Ellis, LLP
                                601 Lexington Avenue
6                               New York, New York 10022
                       BY:   DALE CENDALI, ESQ.
7                            MARY C. MAZZELLO, ESQ.

8                      BY:   JESSE KOEHLER, ESQ.

9  Transcribed by:          Echo Reporting, Inc.
                            Contracted Court Reporter/
10                          Transcriber
                            echoreporting@yahoo.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1 <u>Thursday, December 12, 2019</u>                    <u>10:11 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Calling civil action 18-5945, Social

5 Technologies, LLC versus Apple, Incorporated.

6      Counsel, please step forward and state your appearances

7 for the record.

8          MS. MCGOWIN:  Good morning, your Honor.  My name

9 is Melody McGowin, here for the Plaintiff.

10          THE COURT:  Morning.

11          MS. MCGOWIN:  I also lead counsel, David Hecht and

12 Lee Boyd here today as well.

13          THE COURT:  Hello.

14          MS. CENDALI:  Good morning, your Honor.  Dale

15 Cendali from Kirkland and Ellis for Apple.  With me are my

16 partners, Diana Torres and Mary Mazzello as well as in-house

17 counsel for Apple, Jesse Koehler.

18          THE COURT:  Hello.

19      Okay.  So in both of the cases on today, I'm going to

20 want to start the discussion by addressing sealing.  So has

21 anything been filed?  I seem to remember -- it's a bigger

22 problem with the next case -- but I seem to remember when

23 going through the briefs that there are a number of

24 redactions in the briefs; is that right?  I didn't see

25 anything in -- as I was reading through the briefs and

4

1 looking at all of the redactions, I didn't see anything that

2 seemed like it really should be redacted.  I mean I know

3 that some of this may be embarrassing for the Plaintiffs,

4 but it didn't strike me that anything deserved to be

5 redacted.  All of it seems relevant to deciding the summary

6 judgment in the case and it didn't seem to me that there was

7 any compelling justification for sealing the materials.

8      So let's start -- let me start by asking you, what am I

9 missing?  Is there -- am I missing something?

10          MS. MCGOWIN:  To the extent that Social

11 Technologies had anything that was marked as confidential,

12 it was only something that would have included on the

13 document some sort of, you know, log in or some information

14 that we wouldn't want in the public's sphere.  But

15 otherwise, any of the redactions that have been made in our

16 briefing relates to information that Apple has actually

17 marked confidential, or highly confidential.

18          THE COURT:  Well, but wait.  I'm -- so it's

19 possible that I'm misunderstanding, but I'm looking, for

20 example, at page 12 of Apple's brief -- Apple's initial

21 brief -- and it looks like, unless I'm misunderstanding

22 these -- the highlights that I'm looking at on the brief,

23 the phrase "file the lawsuit and get paid" looks like it's

24 redacted; is that correct?

25          MS. CENDALI:  Yes.  Maybe I can help clear things

5

1  up, your Honor.  Because they had designated certain things

2  confidential in depositions, we filed the briefs respecting

3  that designation, but my understanding is that pursuant to

4  your Honor's rules, they would then have to submit an

5  affidavit indicating that they still want to maintain the

6  confidentiality of that material.

7          THE COURT:  Right.

8          MS. CENDALI:  And I'm not aware of them actually

9  doing that.  So I don't -- I think you'll see in the reply

10  briefs things are not redacted.  So I'm not aware of any of

11  their material that isn't a matter of the public record.

12          THE COURT:  So does that mean that they -- that

13  those materials are now on file on the docket in unredacted

14  form?

15          MS. CENDALI:  That's my understanding, because I

16  think they would have had to file the affidavit to keep them

17  confidential.

18          THE COURT:  Okay.

19          MS. CENDALI:  And I don't think they did that.

20          THE COURT:  Okay.  All right.  Kristin (phonetic)

21  is crinkling her forehead right now.  Figuratively speaking.

22      What's the concern?

23          THE CLERK:  (Inaudible).

24          THE COURT:  Okay so is there any personally

25  identifying information, log in information, social security

6

1  numbers, anything like that in any of the materials that

2  were filed in connection with this motion for summary

3  judgment?

4          MS. CENDALI:  Not that I'm aware of, your Honor.

5          MS. MCGOWIN:  I'm just confirming.

6          THE COURT:  Sure.

7          MS. MCGOWIN:  No, no.  So that's fine.

8          THE COURT:  Okay.  Well in that case, the motion

9  -- all of the motions to seal are denied.  So mechanically,

10 Kristin, do we need to make them refile anything, or will

11 that cause -- will the denial of the motions to seal cause

12 all of the unredacted versions to become public on the

13 docket?

14         THE CLERK:  (Inaudible).

15         THE COURT:  Okay.  All right.  So we'll -- if we

16 need something further, we'll issue an order asking you to

17 clean up the docket.  And by the way, just to warn the

18 parties in the next case, I've tentatively concluded that

19 the same thing should happen in the next case.  And that

20 includes, by the way, the materials filed in support of

21 class certification, which I believe I granted the motion to

22 seal without thinking carefully about it last time, and the

23 materials filed in connection with the motion for summary

24 judgment.  So prepare yourselves to address that if anybody

25 -- if that causes anybody any significant heartache.

7

1            MS. CENDALI:  May I make one more comment on the

2     subject, your Honor?

3            THE COURT:  Yes.

4            MS. CENDALI:  And that is the -- in terms of Apple

5     materials, the only thing we would like your Honor to still

6     consider and treat confidential is that we had in the record

7     our opposed alternative name, if we hadn't been able to

8     acquire the rights from Lucky Bunny, and since that is a

9     true secret business idea that could still at some point be

10    used, we would appreciate it if your Honor would consider

11    letting that non-public information continue to be sealed.

12            THE COURT:  That sounds reasonable to me.

13            MS. CENDALI:  Thank you, your Honor.

14            THE COURT:  So that can remain under seal, or

15    redacted, but everything else will have to -- will have to

16    be unredacted and available to the public.

17        Were you going to say something?

18            MS. CENDALI:  We will obtain --

19            THE COURT:  If you guys can find it -- if you guys

20    can fine it before we wrap up today, I would appreciate

21    that.

22        So other than that, I mean I think the -- my tentative

23    view is that this case is resolved on the bonafide use

24    question and that no reasonable jury could conclude that

25    there was bonafide use and so I think that's sort of made

8

1  clear -- you know, it's sort of highlighted by all of the

2  emails which show what the -- what the Plaintiff was doing

3  here.  So I'll just ask you to tell me what you think I'm

4  missing, why you think that's wrong?

5          MS. MCGOWIN:  In fact, your Honor, we have

6  presented undisputed evidence to show that Social Tech is

7  the only company that has a registered trademark here.  In

8  order to have --

9          THE COURT:  But where -- what's the evidence of

10 bonafide use?

11         MS. MCGOWIN:  So the bonafide -- under the Lanham

12 Act, bonafide use of a mark means that use in the ordinary

13 course of trade and not used made merely to reserve a mark.

14 And bonafide use in commerce does not require a sale of

15 goods, as long as the bonafide use is satisfied as long as

16 the goods are transported in commerce and that's evaluated

17 under a totality of the circumstances, as in <u>Brookfield</u>.

18         THE COURT:  But what was bonafide about this use?

19 I mean it seems that the evidence is that everything that

20 was done was designed to set up a lawsuit against Apple and

21 once it was discovered that Apple was moving forward with

22 this.  So what is the evidence to the contrary?  You have to

23 point to some evidence.  There's tons of evidence that

24 supports that, right?  And it seems to me that you need to

25 point to some evidence to the contrary to barely squeak past

9

1  this motion for summary judgment.

2          MS. MCGOWIN:  So to be able to show there was no

3  bonafide use, it has to be a showing that Social Tech

4  brought its app to market merely for the use -- merely to

5  reserve the mark.  But long before Apple even came onto the

6  scene, this was an important app for our client.  There's

7  evidence in the record showing that Social Tech created a

8  business plan and registered -- after it registered -- I'm

9  sorry -- after it submitted its intent to use application to

10 the PTO, it created presentations that included examples,

11 what its app would look like, it sought investors to be able

12 to bring the app to market.  It created videos, advertising

13 its Memoji, there was a FaceBook page -- or there is a

14 FaceBook page -- including advertising and content related

15 to Memoji and a website and Social Tech worked to develop

16 another app to be able to come up with the funds to actually

17 get its new Memoji app to market.

18     In fact, Social Tech has admitted an extension request

19 to the PTO for additional time to submit a statement of use,

20 which makes clear that Social Tech was still planning on

21 developing its app.

22     In around March of 2018, Social Tech actually got an

23 influx of funds and its other app was in a place where it

24 didn't require a ton of work and Social Tech turned to

25 focusing on the development of the new Memoji app itself.

10

1        As is the time that Social Tech brought the app to
2   market, there's no dispute that it was --
3            THE COURT:  When did Social Tech bring the app to
4   market?
5            MS. MCGOWIN:  On September -- I'm sorry -- on June
6   28th, 2018 Social Tech submitted -- Social Tech's app became
7   live on the Google Play Store for public download.
8            THE COURT:  Right and on July 18th, 2018, this --
9   is it Samuel Bonet (phonetic)?  Is that how you pronounce
10  his name?
11           MS. MCGOWIN:  Yes.  Sorry I misspoke, it was --
12           THE COURT:  It says,
13               "The lawsuit is coming together
14           nicely.  We should be done with the
15           paperwork and forms in the next several
16           day, then we are just waiting for the
17           landmark (sic)-- sorry -- then we are
18           just waiting for the trademark
19           registration to file the lawsuit and get
20           PAID, Almost there."
21       How could any reasonable juror read that email and then
22  the numerous similar emails around the same time period and
23  conclude that any of these activities were for any purpose
24  other than to be able to file a lawsuit against Apple?
25           MS. MCGOWIN:  So Social Tech -- I'd like to point

11

1  you to all of this evidence, that Social Tech was working to

2  actually get its app developed.  Their -- and I'm sorry, I

3  misspoke earlier, it was September 28th on the -- I'm sorry

4  -- July 28th.  So again, your Honor, there may be some

5  interpretation that a jury can make that Social Tech had a

6  motivation to protect its right that it had followed all of

7  the requirements to the letter of law in procuring.

8  However, all of the activity leading up to that point makes

9  clear that Social Tech always intended to use its Memoji

10  mark, and in fact that's what it did.

11         THE COURT:  What activity?  Do you want to point

12  me to the evidence in the record that shows that there was

13  activity before -- you know, before Apple announced that it

14  was moving forward with this?  Do you want to --

15         MS. MCGOWIN:  Sure.  So there was a discussion

16  between Social Tech and its developer.  So Social Tech is a

17  two-man operation and it works with a contract developer to

18  actually do the development.  There was a discussion between

19  the President --

20         THE COURT:  Where is it in the record and when did

21  this take place and --

22         MS. MCGOWIN:  Sure, it's in a deposition Exhibit

23  JJ.  Let me just pull it up.

24         THE COURT:  What page?

25         MS. MCGOWIN:  132-15 through 134-2.

12

1          THE COURT:  Wait a minute, JJ?  I'm in JJ and I'm

2  not seeing -- I've got a page 179, I've got a page 178, 134.

3  Is it JJ?

4          MS. MCGOWIN:  JJ, yes.

5          THE COURT:  The Bonet deposition?

6          MS. MCGOWIN:  The Bonet deposition.

7          THE COURT:  Okay, I've got that and its got 12

8  pages on it.

9          MS. MCGOWIN:  Yes, so starting at --

10          THE COURT:  So which page?

11          MS. MCGOWIN:  -- page 132.

12          THE COURT:  132?

13          MS. MCGOWIN:  Yes.

14          THE COURT:  Okay.  Where?

15          MS. MCGOWIN:  Okay.  So the conversation -- I mean

16  the questioning starts at that point and on page 133

17  starting at line 12, the question was, "You thought Helogies

18  (phonetic) was in a good place."  Helogies is the other app.

19  "So you say you spoke to Mr. Grant."  That's the developer.

20  "In late Spring of 2018; is that right?"  "Yes." "Do you

21  have any documents reflecting that you spoke?"  "I do not,

22  but it was a phone call."

23      So they were discussing the development of the new

24  Memoji app prior to Apple's announcement on June 4th.

25          THE COURT:  Okay so they're -- so he was having a

13

1  conversation with the developer about --

2          MS. MCGOWIN:  Right, to get the development

3  started.

4          THE COURT:  "Justin and I began discussing Memoji

5  on how to build it."  Is what it says.

6          MS. MCGOWIN:  Right.

7          THE COURT:  So that's -- is that your -- is that

8  your best evidence on bonafide use?

9          MS. MCGOWIN:  Well in addition to the fact that

10 Social Tech actually brought the app to the Google Play

11 Store and all of the other evidence --

12         THE COURT:  When was that?

13         MS. MCGOWIN:  On June 28th of 2018.  I'm sorry.

14 On June 28th, 2018.

15         THE COURT:  Okay.  Can I ask Mr. Hecht a question?

16         MR. HECHT:  Absolutely, your Honor.

17         THE COURT:  When did you discovery these emails

18 from your client talking about the lawsuit against Apple and

19 get your -- get ready to buy a Lamborghini and are you ready

20 to get paid?  When did you first see those emails?

21         MR. HECHT:  Melody actually would have been the

22 one to read them first.  Early on in discovery when we

23 started producing documents.  So Spring?  I can tell your

24 Honor, in terms of the --

25         THE COURT:  Can I ask you a question about it?

14

1          MR. HECHT:  Sure.

2          THE COURT:  I mean at that point I would think a

3   lot of lawyers would go to their client and say we're

4   dropping our case, and if we move forward with this case,

5   you know, we're in danger of getting sanctioned, you're in

6   danger of getting sanctioned -- the client.  Why didn't you

7   do that in this case?

8          MR. HECHT:  Your Honor, there's no -- I'm sorry --

9   your Honor, there's absolutely nothing wrong with enforcing

10  registered trademark rights.

11      In this case, the bonafide use had to do with the use

12  that was surrounding the --

13          THE COURT:  The emails don't reflect an

14  enforcement of registered trademark rights.  The emails

15  reflect an attempt to sort of dress themselves up as

16  enforcing -- dressing themselves up as actually doing

17  something so that they can sue Apple.

18          MR. HECHT:  But that's not what --

19          THE COURT:  So they can get --

20          MR. HECHT:  That's the triable --

21          THE COURT:  -- get a big payoff.

22          MR. HECHT:  Sorry, your Honor.  That's the triable

23  issue of fact.  The jury should understand what was done

24  before Apple even came on the scene and whether or not our

25  client accelerated, and then got very excited, because Apple

15

1  happened to use his mark after Apple had initially contacted

2  him through a broker and he knew that something was going on

3  after he took a whole bunch of initial steps.  There's

4  absolutely nothing wrong with it.

5     I mean I have trademark patent clients who get very

6  excited when someone is infringing and say, "We're going to

7  make bank and we're going to sue."  And there's nothing

8  shameful about that.  There is certainly nothing

9  sanctionable about that.  Clients get excited when their

10  rights are infringed.

11          THE COURT:  Yeah, if you're engaged in bonafide

12  use of the mark before that happens.

13          MR. HECHT:  But the bonafide use was -- was

14  starting to take form and the development had happened.

15  Whether or not the -- this had accelerated anything, it does

16  not show any kind of bad intention.  The acceleration just

17  means that he was trying to perfect things as quickly as

18  possible, because the bigger player on the scene, Apple, was

19  about to usurp.

20          THE COURT:  Okay.  I'll issue an order.  I'll take

21  it under submission and I'll issue an order shortly.

22          MR. HECHT:  Your Honor --

23          MS. BOYD:  Your Honor, I would like to address one

24  more triable issue of fact --

25          THE CLERK:  Go to a microphone.

16

1          MS. BOYD:  Didn't realize.  I have a loud voice.

2    Sorry.

3      Your Honor, Kathryn Lee Boyd.  I would like to address

4    triable issues of fact that I think remain, even if your

5    Honor's order remains to be that their registration is

6    invalid because of no bonafide use.

7          THE COURT:  Very briefly.

8          MS. BOYD:  If there's no -- excuse me?

9          THE COURT:  Very briefly.

10          MS. BOYD:  Yes, your Honor.

11      If there is no bonafide use and there is no

12    registration, there is still a fight about priority.  Apple

13    has not moved on their enforcement of rights.  They have

14    acknowledged that they could not prove without -- as a

15    matter of law, right now, that they could enforce their

16    rights under common law.  What they've moved on is an

17    affirmative defense.

18      So if we take out the registration, no more need for

19    the affirmative defense.  Now there's a fight between Chris

20    Anthony's rights, which were purchased, and whether he had a

21    prior use, because he's the developer and the originator of

22    Memoji.  And we purchased his rights.  They purchased Lucky

23    Bunny's rights.  Now the fight becomes, who meets the

24    totality of circumstances test whether or not there was

25    prior use under the Lanham Act.  And that's a question of

17

1  fact, because Lucky Bunny has -- Apple, on behalf of Lucky

2  Bunny, has not met prior use.

3       If they met prior use, then Chris Anthony has met prior

4  use.  And what do I mean by that?  There was a vast

5  interruption between the flurry of six weeks, maybe five

6  weeks, of Twitter and Apple has -- and nothing after that.

7  There was evidence in the record of no advertising.  There

8  was evidence in the record that Mr. Ehrlich (phonetic) of

9  Lucky Bunny gave up, had nothing into the commerce.  That is

10 going to be a deal breaker under the law of the Ninth

11 Circuit.

12      There is no prior use where there is an interrupted

13 non-continuous priority.  They had minor -- a token, if

14 that, Twitter -- tweets -- coming out and one You Tube.

15 There's been no connection by Apple.  And this is a very

16 serious triable issue of fact.  There has been no connection

17 between audiences of these tweets and the actual specimen in

18 the public that is required for the Ninth Circuit to show

19 that there's been a use in commerce, under the Lanham Act.

20      What do I mean by that?  There is no showing that

21 Twitter audience is the actual users of the apps, nor has

22 there been any showing or understanding of why the apps

23 store, if that's going to be the specimen -- and app

24 purchasers -- is going to be circumscribed by the United

25 States.  Apple has a worldwide app store with over a million

18

1  and half apps.  They have at best, which I think is a

2  triable issue of fact, 90,000 downloads, which are

3  considered sales in their mind, but that's a triable issue

4  of fact, over worldwide app store.  There's no understanding

5  from their experts whether or not an average app user --

6          THE COURT:  Could I -- could I just ask you a

7  quick question?

8          MS. BOYD:  Yes.

9          THE COURT:  What claim is this relevant to?  And

10 whose claim is it relevant to?

11         MS. BOYD:  Because now if there's no trademark

12 registration, because there is a presumption of --

13 registration is going to have the presumption.  If there's

14 no trademark -- under your Honor's tentative ruling -- there

15 now becomes a question about whether or not Chris Anthony

16 had prior use rights, common law rights, which we purchased,

17 or Lucky Bunny had common law prior use rights under the

18 Lanham Act.  That's the triable issue of fact now, because

19 no one left has a registration.  The only registration,

20 which gets presumption under the federal law of trademark,

21 is going to be the registration that Social Tech has.  If

22 your Honor deems that that is not a valid registration,

23 because of lack of bonafide use, now it comes down to a

24 triable issue of fact of whether or not the developer of

25 Memoji, this word that's the mark, which was Chris Anthony,

19

1 and we purchased those rights under an agreement very

2 similar to Apple, and whether or not Chris Anthony's rights

3 were equally continuous, without interruption -- and I have

4 a time line of what Chris Anthony's rights looked like along

5 the way --

6          THE COURT:  That's okay.

7          MS. BOYD:  The only difference -- the only

8 difference is that the Apple store had the Lucky Bunny up,

9 but your Honor, there's millions of apps and there is no

10 ruling -- and I doubt that there is a case out there -- and

11 the Ninth Circuit will not find that having an app up, as

12 opposed to a FaceBook page, which Chris Anthony had, and a

13 website, which Chris Anthony had, means that that is a use

14 in commerce.

15     Your Honor, there is -- a use in commerce doesn't mean

16 you just use it in any old way.  It means --

17          THE COURT:  Okay.  Do you want to -- do you want

18 to respond to that last point only?

19          MS. CENDALI:  Yes, yes, yes, your Honor.  Four

20 points on that.

21     One, in their own opening brief on page nine, they

22 admitted they in fact moved for summary judgment on

23 priority, and so that can be something dealt with on the

24 summary judgment and doesn't present a triable issue of

25 fact.

1     Two, they also admitted in their brief that they do not

2  -- and Mr. Bonet as the 30(b)6 witness admitted that Social

3  Tech has no common laws rights and is basing it on their

4  declaration.

5     Three, in our motion for summary judgment, we

6  specifically moved to cancel any rights that they might have

7  with regard to Mr. Anthony.  Their -- it's incumbent under

8  Celotex in Rules of Civil Procedure to submit evidence in

9  response to that.  So I am dumbfounded they did not do that

10 in their reply brief.  Not a word was uttered that Counsel

11 has just said.  They did not make their burden under

12 Celotex, this argument has been weighed and lost.

13    And then finally, on the issue of priority.  Obviously,

14 your Honor, if your Honor keeps his tentative, we're happy

15 to win under any basis, but I will also just say to the

16 Court that there are multiple butra spacies (phonetic) for

17 your Honor to rule and one of them includes priority.

18    And I just mention to your Honor, without getting into

19 in depth, I -- you might find helpful -- I did -- Judge

20 Bencivengo's decision in Seal Shield vs. Otterbox in the

21 Southern District of California.  There she discussed at

22 length the issue of priority under California Law and how to

23 her knowledge -- and this was five years ago, but I know of

24 nothing since then to change it -- but the Ninth Circuit has

25 never found actual use in commerce -- bonafide use in

21

1 commerce -- to not constitutes use in commerce.  And there

2 she found trademark priority when the common law plaintiff

3 had 382 sales of the product before the defendant's filing

4 of its ITU.  Here we have almost 30,000 downloads.

5     So all I'm saying, your Honor, is there are multiple

6 reasons why Apple should win.

7         THE COURT:  Okay.  I'll let you have the last

8 word, briefly.

9         MS. BOYD:  There's triable issues of fact, as the

10 Ninth Circuit has held under the two part test of totality

11 of the circumstances on prior use under the Lanham Act.

12 Lucky Bunny fails.

13         THE COURT:  But what about -- what about the

14 argument that you waived this by not raising it in your

15 brief?

16         MS. BOYD:  Your Honor, Chris Anthony's rights have

17 been -- have been -- first of all, registration was our --

18 we have the registration.  That's the presumption.  The

19 common law rights -- we were not moving under common law

20 rights.  We're not -- brought the case under common law

21 rights.

22     However, just like Apple did, because they did not have

23 a registration, we -- and it's in the record, correct me if

24 I'm wrong, I am parachuting into this case -- it is in the

25 record that we purchased all of Chris Anthony's rights and

22

1  Chris Anthony, your Honor, and this is what juries want to

2  hear, developed this word, this mark.  He came up with it

3  and he filed first at the -- and he put it up on the app

4  store first before Lucky Bunny.  Now it's a fight between

5  priority under the Lanham Act.

6      So that fight -- and your Honor, it raises numerous

7  triable issues of fact that Apple has conceded -- and she

8  didn't address this -- they conceded, they do -- not moving

9  on summary judgment on their counterclaim or on their

10 affirmative enforcement.  They were moving on an affirmative

11 defense, which they came out on reply and said it's a lower

12 standard under the Lanham Act.  Okay?  So now we're talking

13 about enforcement of rights that are common law, non-

14 registered rights.  They purchased Lucky Bunny, we purchased

15 Chris Anthony.  That's in the record.  Chris Anthony now has

16 to be looked at, your Honor has all of the evidence before

17 them.  I'll ask my associate to get that evidence, or we'll

18 put it in a supplemental brief.  It's all in the record.

19 Chris Anthony vs. Lucky Bunny.

20     But even if, which was not addressed, Lucky Bunny has a

21 break in the action -- we have a time line for your Honor

22 that we've written up for today to show that there's a break

23 in the action from December 2nd, 2014 when the Howie Mandell

24 -- which, by the way, there's no showing that Howie

25 Mandell's audience ever buys apps, there's no showing of

23

1 that.  That's the segment of the population we're worried

2 about, is buying apps, or download apps.  No showing at all

3 -- there's been no showing that they have common law rights

4 to enforce here, none.  That's a triable issue of fact.

5     And if they do have common law rights, then I'll tell

6 you what, Chris Anthony does too.  His Memoji was up first,

7 he developed it, he kept his FaceBook page up all along, he

8 came back to reput his Memoji when Apple would let him and

9 he continued to enforced rights.  And we purchased those.

10 The same exact thing that Apple did.  We purchased the

11 original user, and that's what a jury wants to see in

12 trademark.  That he came up with it.

13          THE COURT:  Okay, I've heard your argument and I

14 will take it under submission --

15          MS. CENDALI:  Thank you, your Honor.

16          THE COURT:  -- and issue a ruling.

17     Thank you.

18          MS. BOYD:  Thank you, your Honor.

19     (Proceedings adjourned at 10:40 a.m.)

20

21

22

23

24

25

24

## CERTIFICATE OF TRANSCRIBER

1

2

3     I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9     I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16        Echo Reporting, Inc., Transcriber

17         Wednesday, December 18, 2019

18

19

20

21

22

23

24

25