# EXHIBIT 5



Portfolio Media. Inc. | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Pierce Bainbridge Funding Deal Raises Ethical Red Flags

By **Andrew Strickler**

Law360 (March 16, 2020, 11:03 PM EDT) -- A deal signed by Pierce Bainbridge founder John Pierce to trade half of future returns from a selection of legal cases in exchange for upfront cash includes a handful of unusual elements and ethical red flags, experts told Law360.

The contract came to light in a recent lawsuit accusing Pierce and the firm of exaggerating the value of a case to secure outside funding.

The financing deal, penned two years ago by Arizona-based legal funder Pravati Capital LLC, put the task of valuing cases in the hands of Pierce Bainbridge Beck Price & Hecht LLP. But the responsibility for those valuations — a foundation of any legal funding deal — is typically on the shoulders of the funders, which conduct due diligence on lawyers' cases and track records and then underwrite the deals.

Pravati's 50-50 split on all future fees from a portfolio of cases may also violate the ban on lawyers splitting fees with nonlawyers, an ethics rule intended to protect attorney judgment from outside financial concerns.

"In general I don't bless deals like this because they do look like fee-sharing," said Lucian Pera of Adams and Reese LLP, whose practice includes ethical analysis of third-party funding contracts.

In contrast to the Pravati deal, Pera said, most funders and lawyers take pains to avoid agreements that appear to expressly agree to give a funder a straight cut of future fees, given that all jurisdictions have a rule against fee sharing.

In some cases, that means setting the funder's fee as a multiple of amounts advanced by the funder. Other contracts include a cap on a funder's potential return. Those measures "untether" a funder's take from whatever rewards come from a funded case, Pera said, and thus avoid violating the rule.

"If I was reviewing this for a [lawyer] client, I'd have concerns" regarding a violation under the fee-sharing restrictions spelled out in Rule 5.4 of the American Bar Association's rules of professional conduct, Pera said.

While litigation funders and attorneys take pains to keep their financial tie-ups confidential, the contract Pierce Bainbridge had with Pravati was made public last week in a federal lawsuit filed by a Philadelphia lawyer against Pierce himself and the law firm.

In his complaint, Bruce Chasan accused the firm, Pierce and the other name partners of **pushing him out** of a rights-of-publicity case against Microsoft Studios Inc. and Epic Games Inc. over the alleged use of a former NFL player's likeness in a video game franchise. Chasan had formerly represented the football player.

In the suit, Chasan said he tried unsuccessfully to convince a private funder to back the contingency case, which involved a plaintiff with no means to pay hourly rates, high expert costs and a well-lawyered defense.

Chasan also accused Pierce of "grossly" exaggerating the potential value of the case to secure his own funding from Pravati, as well as a tool for recruiting other attorneys to the Los Angeles firm. Chasan attached to his complaint the Pravati-Pierce Bainbridge contract, which he said Pierce provided to him in March 2018.

Chasan filed his suit the same day a spokeswoman for Pierce Bainbridge told The American Lawyer that Pierce was on a leave of absence after an internal investigation found he had accepted money from a business cash advance company in Queens, New York, known as Karish Kapital LLC.

Three years ago, Pravati and Pierce Bainbridge announced they were striking a substantial portfolio funding agreement. But last May, John Pierce said the partnership was **ending** and that the firm had "long ago" repaid Pravati. He also said the payoff had been completed before a former partner, Donald Lewis, threatened to bring an ongoing case accusing the firm of financial misconduct.

In sometimes vague and incomplete language, the Pravati contract gave the law firm $327,700 to pay its expenses as needed, including for servicing debt or paying taxes. The funding, which brought Pravati's total investment in the firm at that time to $1.172 million, was secured by future contingency fees and expense reimbursements from 18 cases.

Absent a default or an inability to meet an "enhanced distribution condition" — the contract does not define the term — Pravati and the firm would evenly split proceeds from those cases. A failure to meet those conditions would entitle the firm to 25%, with Pravati getting 75%.

If the cases brought in nothing, the firm owed nothing. The contract explicitly gave Pravati no right to make any legal or strategy decisions related to the cases themselves.

According to the contract, in the event of a "material adverse litigation development" within the portfolio, the firm would have to pay Pravati all proceeds from the cases until the funder was repaid. It defines that event as anything Pravati determined would have an adverse effect on the collectibility of the firm's estimated proceeds "as deemed meaningful" by Pravati.

A number of funding experts called that language highly unusual and fraught with danger for the law firm because it allows Pravati to rely on the firm's estimate of the worth of the case but gives the funder the power to decide what constitutes an "adverse" event and trigger a repayment obligation. The contract includes shorthand names for cases in the portfolio but does not include value estimates.

Charles Agee of litigation finance broker and consulting firm Westfleet Advisors said funders do take lawyers' valuations of cases and legal strategies into account when considering funding deals. But that's just one element of funder due diligence, and a far cry from building that responsibility into a financing contract.

"I've never seen a funding agreement where that responsibility was pushed onto the law firm being funded," Agee said. "And I would never advise a law firm client to provide any sort of rep or warranty about the value of a case. There is a big difference there in terms of liability that a law firm is being asked to assume."

Pera also called that provision "troubling," and described it as an outlier among the case funding contracts he has reviewed.

"There is a lot of risk for the lawyer and the firm there," he said. "The attorney doesn't want to be on the hook with that liability, and it does imply that there is some kind of rep and warranty being made."

Portfolio financing is a popular form of litigation funding in which investors advance firms funding on a series of matters — often in related areas or in cases with the same litigants. In exchange, they get a cut of any proceeds from the overall portfolio. Because the deals are made with lawyers and firms rather than with clients, and tie repayments directly to future, unpaid fees, some legal ethics experts have also called portfolio financing a **fee-splitting violation.**

In an email Friday, John Pierce referred questions about the Pravati contract to Pierce Bainbridge's newly named managing partner, Thomas Warren, and an outside public relations firm. Neither

responded to requests for comment.

Pravati CEO Alexander Chucri and other company executives also did not respond to messages.

Pierce Bainbridge, which has represented clients including attorneys **Michael Avenatti** and **Rudy Giuliani**, has been beset of late by legal squabbles.

In addition to the Chasan case, Pierce and the law firm are being sued by former partner Donald Lewis, who has alleged that he was forced out under bogus pretenses after confronting Pierce about financial misconduct, including matters related to the video game likeness case. Pierce has denied those charges and sued Lewis, calling him a **disgruntled, fired attorney** who has tried to extort the business. That case was later dismissed.

"Everything I said about Pierce Bainbridge is proving to be true: dishonesty, lack of ethics, financial foul play," Lewis told Law360. "I exposed the firm as a house of cards and, as the truth comes out, that house is collapsing."

Late last week, another outside funder, West Coast Business Capital LLC, also sued Pierce Bainbridge in a New York court, claiming the firm in February **stopped paying back** a $260,000 advance.

Victoria Sahani, a litigation funding expert and professor at Arizona State University's Sandra Day O'Connor College of Law, said small funders evaluating portfolios of cases may not have personnel with the experience needed to evaluate individual cases.

"Therefore in a portfolio fund a situation like this, the funder will often evaluate the law firm and its business practices generally and then leave it to the law firm to decide which cases to take on," she said in an email. "The funder would still retain the ability to determine what is a material adverse circumstance under the agreement."

She also noted the Pravati contract discusses collateral and other elements of a traditional recourse loan — like a mortgage secured by a property the lender can take if the borrower defaults — despite its self-description as nonrecourse. Legal funders tout their nonrecourse advances — if the case is lost, the firm pays nothing — to distinguish litigation funding from traditional bank loans.

"Courts have ruled that payments on a regular recourse loan that have collateral do not constitute improper fee sharing under Rule 5.4," she said.

--Additional reporting by Emma Cueto, Aebra Coe, Ryan Boysen and Sam Reisman. Editing by Jill Coffey and Emily Kokoll.

*Clarification: This article has been updated to clarify the status and nature of Pierce Bainbridge's suit against Don Lewis, and to include a comment from Lewis.*

All Content © 2003-2020, Portfolio Media, Inc.